## THOMPSON *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 687. Submitted October 18, 1894. — Decided December 3, 1894.

Courts of justice are invested with authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and a defendant is not thereby twice put in jeopardy, within the meaning of the Fifth Amendment to the Constitution of the United States.

Sundry errors in the charge of the court below commented on, and *Gourko* v. *United States*, 153 U. S. 183 approved and applied to the issues in this case, viz.:

   (1) A person who has an angry altercation with another person, such as to lead him to believe that he may require the means of self-defence in case of another encounter, may be justified in the eye of the law, in arming himself for self-defence; and if, on meeting his adversary on a subsequent occasion, he kills him, but not in necessary self-defence, his crime may be that of manslaughter or murder, as the circumstances on the occasion of the killing make it the one or the other:

   (2) If, looking alone at those circumstances, his crime be that of manslaughter, it is not converted into murder by reason of his having previously armed himself.

IN the District Court of the United States for the Western District of Arkansas, on November 23, 1893, a jury was sworn to try the issue formed between the United States and Thomas Thompson, under an indictment wherein said Thompson was charged with the murder of one Charles Hermes, and to which the accused pleaded not guilty.

After the case had been opened by counsel for the government and the defendant respectively, and after Jacob Hermes, a witness for the government, had been called and examined in chief, the judge stated that it had come to his knowledge that one of the jurors was disqualified to sit on account of having been a member of the grand jury that returned the indictment in the case. The defendant, by his counsel, ob-

jected to proceeding further in the trial of the cause with the said juror on account of his incompetency as aforesaid. Whereupon the court ordered the discharge of the jury and that another jury be called, to which action of the court the defendant, by his counsel, at the time excepted.

On November 27, 1893, the defendant filed a plea of former jeopardy, and also a motion for a jury from the body of the district; and it appearing from an examination, in the presence of the defendant, that a number of the regular panel of jurors were disqualified because of opinions formed after having heard part of the evidence, the court ordered the marshal to summon from the bystanders twenty-eight legal voters of the Western District of Arkansas, to be used as talesmen in making up a jury for the trial of the case. On December 1 a motion was filed on behalf of the defendant, to quash that part of the panel of jurors consisting of twenty-eight men summoned from bystanders, which motion was overruled, and the petition of the defendant asking for a jury from the body of the district, drawn in the regular manner from the jury-box by the jury commissioners, was refused. The government's attorney then moved that a jury be called for the trial. The defendant objected to the twelve men being called who had been theretofore empanelled for the trial of the cause, which objection the court sustained, and the clerk was ordered to omit in the call the names of said jurors.

Among the jurors called by the clerk were Wilson G. Gray, William M. Perkins, and Isaac B. Sloan, who were members of the regular panel for the present term of the court, and whose names were on the list of jurors served upon defendant at the beginning of the term, and before the first jury in this cause was empanelled, and when the first jury was empanelled these three jurors were by the defendant peremptorily challenged. Their names were not upon the certified list of jurors last served upon the defendant after the first jury had been discharged. The challenge for cause made by defendant to these three jurors was overruled, whereupon the defendant peremptorily challenged them. The defendant likewise filed a written challenge for cause to the twenty-eight men called

as talesmen, for the reasons that they did not belong to the regular panel of jurors, that they were not from the body of the district, but were all residents of the city of Fort Smith, in the immediate neighborhood of the place of trial. This challenge was overruled.

The jury was thereupon sworn, and the trial proceeded with, resulting in a verdict, under the instructions of the court, for the government in the issue formed by the plea of former jeopardy, and in a verdict that the defendant was guilty of murder as charged in the indictment.

Motions for a new trial and in arrest of judgment were overruled and sentence of death was pronounced against the defendant.

Upon errors alleged in the proceedings of the court, and in the charge to the jury, a writ of error was sued out to this court.

*Mr. A. H. Garland* for plaintiff in error.

*Mr. Assistant Attorney General Whitney,* for defendants in error.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The record discloses that, while the trial was proceeding, a jury having been sworn and a witness examined, the fact that one of the jury was disqualified, by having been a member of the grand jury that found the indictment, became known to the court. Thereupon the court, without the consent of the defendant, and under exception, discharged the jury, and directed that another jury should be called. The defendant, by his counsel, pleaded that he had been once in jeopardy upon and for the same charge and offence for which he now stood charged. The court permitted this plea to be filed, and submitted the question to the jury, with instructions to find the issue in favor of the government. Such a verdict was accordingly rendered, and the cause was then disposed of

under the plea of not guilty, and resulted in a verdict of guilty under the indictment.

The defendant now seeks, in one of his assignments of error, the benefit of the constitutional provision that no person shall be subject for the same offence to be twice put in jeopardy of life and limb.

As the matter of the plea *puis darrein continuance*, setting out the previous discharge of a jury after having been sworn, and the plea of not guilty were not inconsistent with each other, it accorded with the rules of criminal pleading that they might stand together, though, of course, it was necessary that the issue under the first plea should be disposed of before the cause was disposed of under the plea of not guilty. *Commonwealth* v. *Merrill*, 8 Allen, 545; 1 Bishop on Criminal Procedure, § 752.

As to the question raised by the plea of former jeopardy, it is sufficiently answered by citing *United States* v. *Perez*, 9 Wheat. 579; *Simmons* v. *United States*, 142 U. S. 148, and *Logan* v. *United States*, 144 U. S. 263. Those cases clearly establish the law of this court, that courts of justice are invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy within the meaning of the Fifth Amendment to the Constitution of the United States.

The evidence in the case substantially disclosed the following facts:

The defendant, Thompson, was an Indian boy about seventeen years of age, and lived with Sam Haynes, a Creek Indian, who had a farm near Okmulgee in the Creek Nation. The deceased, Charles Hermes, lived with his father on land rented from Haynes, and distant about half a mile from the house of the latter. There was testimony tending to show ill feeling on the part of Hermes and his sons towards this Indian boy, and that they had threatened to injure him if he

came about where they were. Thompson could not speak or understand the English language, but he had been told by Haynes and another witness that old man Hermes had claimed that he, Thompson, had been abusing and killing his hogs, and that if he "came acting the monkey around him any more he would chop his head open."

In the afternoon of June 8, 1893, Mrs. Haynes directed the boy to take a bundle to Mrs. Checotah's, who lived two or three miles away. The boy caught a horse, got on it without a saddle, took the bundle that Mrs. Haynes gave him, and went off on his errand. Mrs. Haynes testified that he had no arms of any kind when he left her house, and that he appeared in a good humor with everybody at that time. The road to Checotah's ran by a field where the deceased, his father and brother were working, ploughing corn. There was testimony, on the part of Thompson, tending to show that, as he rode along past the field, the old man and the deceased began quarrelling with him; that Thompson saw that they were angry with him, but could not understand much that was said to him, although he could tell that they were talking about hogs. Thompson says that he remembered the threats against him they had made to Haynes and Checotah, and thought they were going to hurt him. He further states that he rode on to Checotah's, where he left the bundle; that he got to thinking about what Sam Haynes had told him as to the threats that Hermes had made, and as there was no other road for him to return home by, except the one alongside of the field, he thought it was best for him to arm himself so that he could make a defence in case he was attacked; that he went by Amos Gray's house, and there armed himself with a Winchester rifle belonging to Gray. The defendant further testified that, after he got the gun, he went back by the road, and, as he got opposite where the men were ploughing the boys were near the fence, and the old man was behind; that the boys called at him and said something about a gun, and the deceased started towards a gun that was standing in the corner of the fence, and that, thinking they intended to kill him, he drew his gun and fired at

the deceased, and then ran away on his horse, pursued by the old man, who afterwards shot at him. These particulars of the transaction were principally testified to by Thompson himself, but he was corroborated, to some extent, by William Baxter and James Gregory, who testified that they visited the field where was the body of the deceased, and that Hermes, the father, described the affair to them, and, as so told, the facts differed but little from Thompson's version.

In this state of facts, or, at all events, with evidence tending to show such, the court instructed the jury at great length in respect to the law of the case. Exception was taken to the charge of the court as a whole, because it was "prolix, confusing, abstract, argumentative, and misleading," and this exception is the subject of one of the assignments of error. But we do not need to consider this aspect of the case, as the record discloses errors in vital portions of the charge, and specifically excepted to, which constrain us to reverse the judgment, and direct a new trial.

In instructing the jury as to the right of self-defence, the learned judge said: "It is for you to say whether at the time of the killing of Charles Hermes by this defendant that this defendant was doing what he had a right to do. If he was not, notwithstanding. Charles Hermes might have made a violent demonstration that was then and there imminent, then and there impending, then and there hanging over his head, and that he could not avoid it except by killing him; if his conduct wrongfully, illegally, and improperly brought into existence that condition, then he was not in an attitude where, in the language of the law, he was in the lawful pursuit of his business." And again: "Now, in this connection, we have a maxim of the law which says to us that notwithstanding the deceased at the time of the killing may be doing that which indicates an actual, real, and deadly design, if he by his action who seeks to invoke the right of self-defence brought into existence that act upon the part of the deceased at that time by his wrongful act, his wrongful action did it, he is cut off from the law of self-defence, no matter what may have been the conduct of the deceased at that time."

It is not easy to understand what the learned judge meant by those portions of these instructions, in which he leaves it to the jury to say whether the defendant was " doing what he had a right to do," and whether the defendant brought into existence the act of the deceased, in threatening to attack the defendant, " by his, defendant's, wrongful act." Probably what was here adverted to was the conduct of the deceased in returning home by the same route in which he had passed the accused when going to Checotah's, and the implication seems to be that the accused was doing wrong and was guilty of a wrongful act in so doing. The only evidence on that subject was that of the defendant himself, that he had no other mode of returning home except by that road, because of swamps on the other side of the road, and there was no evidence to the contrary.

The learned judge, in these and subsequent instructions, seems to confuse the conduct of the defendant in returning home by the only convenient road, with a supposed return to the scene of a previous quarrel for the purpose of renewing it. Thus, he further instructed the jury that " if it be true that Charles Hermes, at the time of the killing, was actually and really, or apparently, in the act or executing a deadly design, or so near in the execution of it that the defendant could not avoid it, and that it was brought into existence by his going to that place where Charles Hermes was, with the purpose of provoking a difficulty, or with the intention of having an affray, he is cut off from the law of self-defence." And again : " You are to look to the evidence to see whether the defendant brought that state of case into existence, to see whether or not in consequence of a conception on his part of a state of grudge, or ill-will, or any hard feelings that existed between the parties, that he went off and armed himself for the purpose of making an attack on Hermes, or any of the party whom the government offered as witnesses, this law of self-defence cannot avail him. Of course, the law of self-defence gives him the right to arm himself for the purpose of defending himself so long as he is in the right, but if he has a conception that deadly danger may come upon him, but he is

away from it so he can avoid it, his duty is to stay away from it and avoid it, because he has no right to go to the place where the slain person is, with a deadly weapon for the purpose of provoking a difficulty, or with the intent of having an affray."

These instructions could, and naturally would, be understood by the jury as directing them that the accused lost his right of self-defence by returning home by the road that passed by the place where the accused was, and that they should find that the fact that he had armed himself and returned by that road was evidence from which they should infer that he had gone off and armed himself and returned for the purpose of provoking a difficulty. Certainly the mere fact that the accused used the same road in returning that he had used in going from home would not warrant the inference that his return was with the purpose of provoking an affray, particularly as there was evidence that this road was the proper and convenient one. Nor did the fact that the defendant, in view of the threats that had been made against him, armed himself, justify the jury in inferring that this was with the purpose of attacking the deceased and not of defending himself, especially in view of the testimony that the purpose of the defendant in arming himself was for self-defence.

We had occasion to correct a similar error in the recent case of *Gourko* v. *United States*, 153 U. S. 183. That was a case where the deceased had previously uttered threats against the defendant, and there had been a recent *rencontre* at the post office. The parties then separated, and the defendant armed himself, and subsequently, when the parties again encountered each other, the defendant shot and killed the deceased. The court instructed the jury that, in those circumstances, there was no right of self-defence, and that there was nothing to reduce the offence from that of murder to manslaughter.

In discussing the question this court, by Mr. Justice Harlan, said :

"Assuming, for the purposes of the present inquiry, that the defendant was not entitled to an acquittal as having acted

in self-defence, the vital question was as to the effect to be given to the fact that he armed himself with a deadly weapon after the angry meeting with Carbo in the vicinity of the post office. If he armed himself for the purpose of pursuing his adversary, or with the intention of putting himself in the way of his adversary, so as to obtain an opportunity to kill him, then he was guilty of murder. But, if in view of what had occurred near the post office, the defendant had reasonable grounds to believe, and in fact believed, that the deceased intended to take his life, or to inflict upon him great bodily harm, and so believing armed himself solely for necessary self-defence in the event of his being pursued and attacked, and if the circumstances on the occasion of the meeting at or near the saloon were such as, by themselves, made a case of manslaughter, then the defendant arming himself, after the difficulty near the post office, did not, in itself, have the effect to convert his crime into that of murder.

"Stated in another form: Although the defendant may not have been justified on the occasion and in the particular circumstances of the difficulty at the billiard saloon in believing that the taking of his adversary's life was, then and there, necessary to save his own life or to protect himself from serious bodily harm, nevertheless the jury were not authorized to find him guilty of murder because of his having deliberately armed himself, provided he rightfully armed himself for purposes simply of self-defence, and if, independently of the fact of arming himself, the case, tested by what occurred on the occasion of the killing, was one of manslaughter only. The court, in effect, said, or the jury may not unreasonably have understood the judge as declaring, that preparation by arming, although for self-defence only, could not be followed, in any case, by manslaughter, if the killing, after such arming, was not in fact in necessary self-defence. Such we understand to be the meaning of the charge. In our opinion the court erred in so charging the jury: 'If the accused was justified in the eye of the law in arming himself for self-defence, and if, without seeking, but on meeting his adversary, on a subsequent occasion, he killed him, not in necessary self-

defence, then his crime was that of manslaughter or murder, as the circumstances, on the occasion of the killing, made it the one or the other. If guilty of manslaughter, looking alone at those circumstances, he could not be found guilty of murder by reason of his having previously armed himself solely for self-defence."

We think there was also error in that portion of the charge wherein the court instructed the jury as to the effect which they should give to the evidence on the subject of previous threats, uttered against the defendant by Hermes and his sons. The learned judge seems to have regarded such evidence not merely as not extenuating or excusing the act of the defendant, but as evidence from which the jury might infer special spite, special ill-will, on the part of the defendant. The language of the learned judge was as follows:

"Previous threats fill a certain place in every case where they are brought out in the evidence. If, at the time of the killing, the party is doing nothing which indicates a deadly design, or a design to do a great bodily mischief — if he is doing nothing, I say, of that kind — then previous threats cannot be considered by the jury. If they are satisfied from the law and the testimony that the deceased was not doing anything that amounted to a deadly attack, or there is no question in their minds as to what the attitude of the deceased was, previous threats cannot be considered by them; they cannot enter into their consideration of the case by the way of justifying any act that resulted in the death of Charles Hermes from the act of defendant; they cannot be considered, I say, because you cannot kill a man because of previous threats. You cannot weigh in the balance a human life against a threat. There is no right of that kind in law. Threats are only admitted as illustrative of another condition that exists in the case. If the party, at the time of killing, who is killed, is doing that which indicates a purpose to do great bodily harm, to kill, or is about to do it, so near doing it, and goes so far that it can be seen from the nature of the act what his purpose is, then for the purpose of enabling you to more clearly see the situation of the parties you can take into consideration the

threats made by him. But if there is an absence in the case of that which indicates a deadly design, a design to do great bodily harm, really or apparently, threats cannot be considered in connection with the asserted right of a defendant that he can avail himself of the right of self-defence. You cannot do that. But if threats are made, and there is an absence from the case of the conditions I have given you where you can use them as evidence, *you can only use them and consider them for the purpose of showing the existence of special spite or ill-will or animosity on the part of the defendant.*"

And again :

" If this defendant killed this party, Charles Hermes, because the old man, the father of Charles Hermes, had threatened him with violence, or threatened to have something done to him because of his belief that he had done something with his hogs or killed them and made threats, that is no defence, that is no mitigation, but that is evidence of malice aforethought; it is evidence of premeditation ; it is evidence of deliberation of a deliberately formed design to kill, because of special spite, because of a grudge, because of ill-will, because of animosity that existed upon the part of this defendant towards these people in the field."

While it is no doubt true that previous threats will not, in all circumstances, justify or, perhaps, even extenuate the act of the party threatened in killing the person who uttered the threats, yet it by no means follows that such threats, signifying ill-will and hostility on the part of the deceased, can be used by the jury as indicating a similar state of feeling on the part of the defendant. Such an instruction was not only misleading in itself, but it was erroneous in the present case, for the further reason that it omitted all reference to the alleged conduct of the deceased at the time of the killing, which went to show an intention then and there to carry out the previous threats.

The instructions which have thus far been the subject of our criticism were mainly applicable to the contention that the defendant acted in self-defence, but they also must have been understood by the jury as extending to the other proposi-

tion that the defendant's act constituted the crime of manslaughter and not of murder. The charge shows that the instructions of the learned judge, on these two distinct defences, were so blended as to warrant the jury in believing that such instructions were applicable to both grounds of defence.

Whether this be a just view or not, there were distinct instructions given as to the contention that the act of killing in this case was manslaughter and not murder, which we think cannot be sustained. A portion of such instructions was as follows:

" Now I have been requested to charge you upon the subject of manslaughter. Manslaughter is defined by the law of the United States to be the wrongful killing of a human being, done wilfully, and in the absence of malice aforethought. There must be out of the case that which shows the existence or this distinguishing trait of murder, to find the existence of a state of case that authorizes a mitigation of the offence from murder to manslaughter. It is an unlawful and wilful killing, but a killing in such a way as that the conduct of the deceased Hermes, in this case, at the time he was killed, was not of a character to authorize him to shoot, but that the defendant could so far have the benefit of that conduct provocative in its nature as that he could ask you to mitigate his crime, if crime exists here, from murder to manslaughter. Let us see what is meant by that. It cannot grow out of any base conception of fear. It cannot grow out of a state of case where there is a killing because of threats previously made, because of that which evidences special spite or ill-will, for if the killing is done on that ground, and if it is shown by the threats, and the previous preparation of the defendant, or the fact of his arming himself, and going back to the field where they were at work, and while there he shot Charles Hermes to death, it cannot be evidence of that condition; but at the time of the killing there must have been that in the conduct of Charles Hermes in the shape of acts done by him that were so far provocative as to then and there inflame the mind of the deceased [defendant] to authorize you to say that it was so inflamed; in such an inflamed condition that the defendant did not act

with premeditation; that he did not act from a previously formed design to kill, but that the purpose to kill sprang into existence upon the impulse of the moment because of the provocative conduct of Charles Hermes at the time of the killing, that would be a state of manslaughter. .. . . . The law says that the previous selection, preparation, and subsequent use of a deadly weapon shows that there was a purpose to kill contemplated before that affray existed, and whenever that exists, when it is done· unlawfully and improperly so that there is no law of self-defence in it, the fact that they may have been in an actual affray with hands or fists would not reduce the grade of the crime to manslaughter."·

The. error here is in. the assumption that the act . of the defendant in arming himself showed a purpose to kill formed before the actual affray. This was the same error that we found in the instructions regarding the right of self-defence, and brings the case within the case of *Gourko* v. *United States,* previously cited, and the language of which we need not repeat.

These views call for a reversal of the judgment, and it is therefore unnecessary to consider the assignments that allege errors in the selection of the jury.

*The judgment is reversed, and the cause remanded for a new trial.*