# WILLIAM CORNELIUS JONES *v.* STATE OF MARYLAND

[No. 530, September Term, 1972.]

*Decided April 11, 1973.*

The cause was argued before ORTH, C. J., and SCANLAN and DAVIDSON, JJ.

*John J. Garrity, Assigned Public Defender,* with whom was *Edward P. Camus, District Public Defender for Prince George's County,* on the brief, for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Richard P. Arnold, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

WILLIAM CORNELIUS JONES, calling upon the Fifth Amendment to the Constitution of the United

States, claims that if he were now tried on a charge that he robbed Eugene Alfred Contee with a deadly weapon on 9 October 1971 he would be "subject for the same offense to be twice put in jeopardy of life or limb." He is correct.

## I

The double jeopardy claim of the Fifth Amendment is applicable to the States through the Fourteenth Amendment. *Benton v. Maryland,* 395 U. S. 784, 787. The constitutional policies underpinning the Fifth Amendment's guarantees are implicated when an accused in a criminal proceeding is put on trial before the trier of fact, whether the trier be a jury or a judge. *Green v. United States,* 355 U. S. 184, 188; *Wade v. Hunter,* 336 U. S. 684, 688. Beyond any question, Jones was placed in jeopardy for the crime of robbing Contee. An indictment filed in the Circuit Court for Prince George's County on 22 February 1972 charged him with the offense.[1] It came on for trial before a jury on 21 June 1972 on his plea of not guilty. Four witnesses were called by the State and examined before court adjourned for the day. The next morning when trial resumed the court declared a mistrial *sua sponte* over the objection of Jones. The precise question is when does a mistrial, judicially declared over the objection of the defendant, raise the double jeopardy barrier against a second prosecution.

The fountainhead decision on the question is *United States v. Perez,* 9 Wheat. (22 U. S.) 579 (1824). Mr. Justice Story, for a unanimous Court, said, at 580:

"We think, that in all cases of this nature, the law has invested Courts of justice with the

---

1. The first count of the indictment charged him with the robbery with a deadly weapon of Contee. Related offenses were charged in counts two through eight inclusive. Ernest Robert Dudley was jointly charged with Jones. As to Dudley, the indictment was stetted on 6 June 1972 and nol prossed on 20 July 1972. It seems that Dudley had been shot and killed.

authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

In its most recent case on the question, *Illinois v. Somerville*, 93 S. Ct. 1066, decided 27 February 1973, the Supreme Court said, at 1069: "This formulation, consistently adhered to by this Court in subsequent decisions, abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." The circumstances leading to the declaration of a mistrial in the case before us demonstrate the validity of the Court's characterization of the situations arising during the course of a criminal trial as "varying and often unique."

## II

During the course of defense counsel's opening statement to the jury, he said:

"... We will show as a matter of fact that the State's witnesses, both Mr. and Mrs. Contee,

have sold heroin, they are narcotics dealers, they did in fact live in Livingston Terrace, and we will show Mr. Contee's actual criminal record when he takes the stand . . ."

At a bench conference the Assistant State's Attorney requested the court to declare a mistrial *sua sponte.* He argued that what defense counsel said he would show was clearly inadmissible and "totally inflammatory." In answer to the court's inquiry as to what he intended to prove with respect to Mr. and Mrs. Contee dealing in heroin, defense counsel said he had a statement from each of them to that effect. The court did not approve "of that type of introductory statement" but did not think that "it is inflammatory to the extent it prejudices the jury." It believed that the matter of prior criminal record went to the credibility of Contee as a witness. The Assistant State's Attorney asserted that the prior criminal record of a witness could not be used for impeachment.[2] He said: "The only way you can do that is if it is directly relevant to the case, it has some bearing on this particular case." The court said it would reserve its opinion on the motion for mistrial to give the State an opportunity to show that what it asserted was the law. After a short recess the court announced at a bench conference: "The motion for a mistrial is denied inasmuch as the State is unable to furnish any proof of the proffer made to the Court as to what the law was."

During the course of its case, the State called Eugene Alfred Contee, the victim of the robbery. He said that he lived at Livingston Terrace, 5008, Oxon Hill, Maryland, on 9 October 1971. He was asked by the Assistant State's Attorney: "And at that time would you tell us what it was you were doing for a living?" The transcript of the proceedings reads:

"A. Well, I was working part-time in a T.V. Shop, and I was hustling.

---

2. The law is otherwise. See Code, Art. 35, § 10; *Johnson v. State,* 4 Md. App. 648, 657.

Q. And when was that when you say hustling?
A. When was that?
Q. Yes.
A. On October 9.
Q. What do you mean when you say hustle?
A. That I, you know, sell drugs for a living.
Q. What type of drugs were you selling?
A. Reefer.
Q. Beg your pardon?
A. Reefer, heroin.
Q. Are you still in that line of trade?
A. Not now.
Q. When did you stop?
A. Couple months ago, four or five months ago."

Contee then recounted the robbery of him on 9 October 1971.

On the cross-examination of Contee, he was questioned about how he made his living. It was adduced that he had not worked in the T.V. repair shop for nine months to a year. He did not believe he worked there at the time of the robbery. "I would work there off and on . . . I worked in the sales department, and occasionally I drove a truck." He also worked occasionally—"whenever I wanted to"—as a painter in an automobile body and fender repair shop. The matter of his narcotics dealing was pursued:

"Q. Now, be very candid about it, you didn't have these T.V. shop jobs or the job at the body shop to support your family, really?
A. No.
Q. That was more a cover-up than anything?
A. Yes.
Q. You really made your living and supported your family and made the money by selling narcotics?
A. Not necessarily; no.

Q. Did you make a substantial part of your money by hustling?

A. Somewhat.

Q. Did you report the income from this hustling and sales of narcotics on your Internal Revenue—

A. No, not then.

Q. Have you filed your income tax for the year 1971?

A. Yes, I have filed them, but I haven't sent them in yet.

Q. You mean you made them out?

A. Made them out.

Q. Do you plan to record your income from hustling to Internal Revenue?

A. No. No.

Q. Now, you indicate that you were selling reefers. What exactly is a reefer?

A. Marijuana.

Q. And you also sold heroin?

A. Yes.

Q. How long were you in that?

A. Maybe a year, year and a half.

Q. And did you have any particular clientele or did you sell it to whomever you trusted?

A. I had a particular clientele.

Q. Sell to any youngsters?

A. No.

Q. Always made sure they were how old?

A. My age or more.

Q. How old are you, sir?

A. Twenty-seven."

Contee persistently denied that any of the cash of about $1500 stolen from him in the robbery was from the sale of narcotics—"not a penny." "That money came from little things that I was doing, not narcotics or anything." He was sure of that "Because I didn't have anything at the time." Defense counsel pursued the subject:

"Q. Where do you keep the money from the sale of narcotics, in the bank?

A. No; I don't keep it anywhere. I never got in a position where I ever accumulated enough where I could do anything with it that I wanted to do because of losses that I took in particular places.

Q. Are you telling us in the sale of narcotics or hustling or heroin you never made any money?

A. Yes; I made some money. Yes. I didn't say I didn't make any."

Defense counsel returned to the matter later in the cross-examination. Contee testified that he identified Ernest Robert Dudley as one of the robbers, and in answer to the question "Do you know what happened to Dudley?" he said that Dudley had been shot and killed. The cross-examination continued:

"Q. And you know it wasn't really a hold-up, don't you?

A. I don't know what happened. All I know is what I heard.

Q. Did you make a statement to Mr. Campbell [a Public Defender Investigator] that was no hold-up when Dudley was killed?

A. Yes.

Q. Tell us why you said that.

A. Because I had heard through other sources that something else went down.

Q. Holding up marijuana men, heroin sellers, isn't quite accepted, is it, in the community?

A. I don't know. No; holding up anybody isn't accepted in any community.

Q. Particularly in your hustling community holding up a heroin dealer isn't particularly regarded as fair play, is it?

A. Well, really no where.

Q. Did you have anything to do, Mr. Contee, with doing away with Dudley?

A. No."

It was adduced that Contee knew Dudley before the robbery but had never seen Jones before. He was asked if he had "any idea how [Jones] got arrested?"

"A. No; I don't. I don't have any idea whatsoever. All I know is that I gave over some information that I had received from a reliable source, and I gave it to him.

Q. And that reliable source called up on the telephone?

A. Right.

Q. And he was one of your co-hustlers?

A. Not necessarily. Just a friend.

Q. But he knew something about the narcotics trade, didn't he?

A. I assume that he do; yes.

Q. Do you want to identify him to the members of the jury and the Court?

A. No; he is not in here.

Q. Why not?

A. Because I don't, you know.

Q. You don't know what?

A. Because I don't want to divulge my source of information.

Q. Now, did this person tell you that he had personal knowledge of who was involved in the hold-up?

A. He told me that he—

Q. Just answer my question. Did he have personal knowledge of who was involved in the hold-up?

A. Yes.

Q. Did you relay the name of this informant to the police or Mr. Arnold? [Assistant State's Attorney]

A. No.

Q. Did they ask you for it?
A. No."

The informant gave Contee the name of Cornelius Jones as one of the men involved in the hold-up, and "he gave me a piece of paper with his tag number on it, his driver's license, his name and his address where he lived." Contee gave that address to the police. That was the last he heard of Jones until he was asked to attend a lineup in which Jones appeared. Defense counsel probed further into Contee's illicit narcotic activities:

"Q. Did you tell Detective Daniels or anybody from the police that you were involved in hustling and the sale of narcotics?
A. No. I assume they already knew.
Q. But you didn't tell them?
A. No.
Q. Nor did you tell Mr. Arnold, who is in charge of prosecuting this case?
A. No. I know they already know."

Contee had testified on direct examination that among his personal property taken in the robbery was a diamond ring. He was asked on cross-examination what was the value of the ring and replied, "Two thousand dollars." The next question was, "Did you buy that from the proceeds of the sale of heroin?" He answered, "No."

The defense brought out Contee's prior criminal record:

"Q. Do you have a criminal record?
A. Yes.
Q. What is it, Mr. Contee?
A. I have a housebreaking charge I was arrested on and did time for.
Q. How much time did you do?
A. Two and a half years.

Q. Is that in the District of Columbia?
A. Yes.
Q. What else?
A. I had a narcotics charge, and still pending.
Q. Anything else?
A. Two or three other charges.
Q. Do you remember what they would be?
A. No."

Defense counsel refreshed his recollection. He served 90 days for carrying a deadly weapon and 90 days for discharging a firearm in the District of Columbia.

Upon the conclusion of the examination of Contee, a police officer testified on behalf of the State, and thereafter court adjourned until the following day. When trial resumed a conference was held out of the presence of the jury. The State requested that the court grant a mistrial *sua sponte* on the ground that "specific acts of misconduct falling short even of arrest or accusation may not be used to impeach the witness." Its authority was *Neam v. State,* 14 Md. App. 180. Defense counsel objected vigorously. He presented the full range of reasons why the trial should continue. He observed that his opening statement was not evidence and that the court had found that it had not prejudiced the jury. He pointed out that the State had opened the door to his cross-examination of Contee by its questions on direct examination, and that no objection whatever had been made to the cross-examination. He noted inconsistencies in the testimony of the State's witnesses and argued that the jury should have the opportunity to weigh that evidence as given and the credibility of the witnesses based on that testimony. It would be fundamentally unfair and deny basic justice, he asserted, to enable the witnesses to correct the inconsistencies at a retrial. The court declared a mistrial. In apparent reliance on *Neam,* it gave the reasons for its action:

> "I think, frankly, irreparable damage has been done, and I think it has been done merely

because the Court was not informed, nor did he know what the law was. * * *

So, clearly to me if any inadmissible testimony has been allowed to be elicited from this witness, caused by the erroneous decision of the judge, then I think the judge is responsible for it and he ought to correct it, whether it is in favor of the defense or whether it is in favor of the State. My natural reluctance, of course, is to deny motions of this type, but where the interests of justice outweigh the inconvenience of the parties I am inclined to rule in a manner that would serve justice rather than the time consumed by another day in court.

It is true that these witnesses will have an opportunity to think about their testimony and maybe vary it, but you have, of course, the right to attack that double-barreled because you have a transcript of this testimony available to you for that purpose.

In a sense of fairness to both sides, and I think if the shoe was on the other foot it would be no question, if it was anything at all to jeopardize the defendant, there would be no question but what it would be granted, and I think the State should be put at least to some degree to that same measure of justice.

For that reason the Court on its own motion declares a mistrial . . . Sua sponte."

The case was set for retrial on 9 August 1972. On 4 August Jones filed a Motion to Dismiss Indictment on the ground that another trial thereon would place him twice in jeopardy. Upon motion by Jones, agreed to by the State, the case was continued from 9 August to 15 September to enable a hearing on the motions. The State filed an Answer in Opposition to Dismissal of Indictment. The motion to dismiss was denied on 11 September 1972. Jones noted the appeal now before us.

### III

In *Baker, et al. v. State,* 15 Md. App. 73, 89, we stated our conviction that the question whether retrial following a *sua sponte* judicially declared mistrial without the defendant's consent is prohibited by the double jeopardy clause of the Fifth Amendment is to be resolved by a determination whether the mistrial declaration was an abuse of judicial discretion. We were satisfied that "abuse of judicial discretion" is to be assessed by manifest necessity, and we were persuaded that manifest necessity is to be ascertained by reference to the purpose and effect of the mistrial ruling concerned, and by considering abuse of the trial court's discretion in declaring the mistrial in the context of whether there was an abuse of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. This was our interpretation of the manifest necessity standard of *United States v. Perez, supra,* as explicated by *Gori v. United States,* 367 U. S. 364. We see nothing in *Illinois v. Somerville, supra,* to cause us to change our view.

In the instant case, looking to the purpose of the mistrial ruling, we find no abuse of the trial process compelling the mistrial. The judge below made clear that the mistrial was granted because he had been wrong in permitting evidence of Contee's illicit narcotics activities to go before the jury. In the circumstance, we do not believe that he was wrong with respect to that evidence. We look first to the opening statement of defense counsel. If it were improper, the impropriety with respect to the remarks about Contee's narcotics dealings were utterly erased by the State. The State proved through its own witness exactly what the defense said would be proved, that Contee was a narcotics dealer. Any impropriety with respect to Contee's prior criminal record was harmless in the light of the showing by the defense that he had a prior criminal record. With regard to the cross-examination of Contee concerning his

narcotics activities, we think there were two reasons why the admission of the evidence thus adduced was not reversible error in any event. First, there was no timely objection made by the State as required by the Rules of Procedure and thus objection was waived. Maryland Rule 522 d 2; *Swann v. State,* 7 Md. App. 309. Second, the subject had been entered upon in the examination in chief by the State, permitting the defense to ask any relevant question on the subject. *Duncan v. State,* 5 Md. App. 440. As the State's examination in chief solicited testimony regarding Contee's criminal behavior, the fact that cross-examination on the point may have proved prejudicial to the State did not provide grounds for a valid complaint, since it was within the proper scope of examination on matters introduced on direct testimony. *Cornwell v. State,* 6 Md. App. 178. The court's reliance on *Neam v. State, supra,* was misplaced. In *Neam,* the door had not been opened on direct examination, and, it was in that circumstance we held, pursuant to the firmly established rule, that specific acts of misconduct falling short even of arrest or accusation may not be used to impeach a witness. 14 Md. App. 180. Of course, the general rule was applicable with respect to Contee's prior convictions of other crimes. When he took the stand and testified, evidence of those convictions was properly admissible to impeach his credibility. *Johnson v. State, supra; Boone v. State,* 2 Md. App. 80.

There being no validity to the reason for the mistrial, its declaration was an abuse of the trial process, and that abuse resulted in prejudice to the accused, at the least by way of harassment or the like, such as to outweigh society's interest in the punishment of the crime. "The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one . . . Nor will lack of demonstrable additional prejudice preclude the defendant's invocation of the double jeopardy bar in the absence of

some important countervailing interest of proper judicial administration." *Illinois v. Somerville, supra,* at 1073-1074. Here, the "irreparable damage" the court below found to have been done on the basis of its incorrect construction of the law was to the State, and in the particular circumstances, this cannot be said to be an "important countervailing interest of proper judicial administration." Jones was entitled to have his fate determined by the jury first empaneled.

In so referring to the purpose and effect of the mistrial ruling, and by so considering abuse of the trial court's discretion in declaring the mistrial in the context of whether there was an abuse of the trial process resulting in prejudice to the accused such as to outweigh society's interest in the punishment of crime, we reach the inescapable conclusion that there was no manifest necessity for the court below to declare the mistrial. Therefore, the judicial declaration over Jones's objection was an abuse of judicial discretion. As it was an abuse of judicial discretion, it raised the double jeopardy barrier against a second prosecution. We hold that the court below erred in denying the motion to dismiss the indictment.

> *Order of 11 September 1972 denying motion to dismiss the indictment reversed; case remanded with direction to grant the motion to dismiss the indictment.*