567 A.2d 449

**STATE of Maryland**

v.

**Gloria CRUTCHFIELD.**

**No. 64, Sept. Term, 1989.**

Court of Appeals of Maryland.

Dec. 28, 1989.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for petitioner.

Benjamin Lipsitz (Jay Fred Cohen, Eleanor J. Lipsitz, all on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr., Retired, Specially Assigned Judge.

MURPHY, Chief Judge.

This case involves the *sua sponte* declaration of a mistrial by a trial judge in a criminal case and whether, in the circumstances, retrial of the defendant would violate the double jeopardy clause of the Fifth Amendment to the Federal Constitution, now applicable to the states through the Fourteenth Amendment under *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).[1]

---

1. The Fifth Amendment provides, in pertinent part, that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."

## I.

On January 17, 1987, the Maryland State Police responded to a call regarding a shooting at a home in Mt. Airy, Maryland. Trooper Douglas Wehland, the first to arrive at the scene, discovered Gloria Elizabeth Crutchfield on the porch of the residence; she implored Wehland to come to the shooting victim's aid. Crutchfield had blood on her skin and clothing. In response to Wehland's inquiry, she stated that she had shot a man, later identified as William Richard Lawrence. The victim was lying on the floor, bleeding. At no time during this period did Wehland advise Crutchfield of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Emergency medical personnel and other police officers thereafter arrived on the scene, among them Corporal Joseph Marick and Trooper Donald Lewis. Marick took two statements from Crutchfield without advising her of her *Miranda* rights. In the first statement, which was taken in the kitchen of the residence, Crutchfield told Marick that she and Lawrence argued because he had arrived home late; that she had turned up the thermostat to anger him; and that Lawrence then pulled her hair, struck her, picked up a knife and threatened her. In this statement, Crutchfield admitted that she took a handgun from her pocketbook, and that she and Lawrence struggled over the gun, which discharged toward the ceiling. Crutchfield told Marick that she then regained possession of the gun and, instead of shooting Lawrence in the arm as she intended to do, she shot him in the head. As part of this statement, Crutchfield said that when Lawrence was shot they were still struggling over the gun. In response to Marick's inquiry as to why she had a gun in her purse, Crutchfield said that she didn't know what kind of party she was going to and had it just in case.

Shortly after he took this statement, Marick took Crutchfield to his police cruiser where he asked her to once again relate the details of the shooting. Crutchfield told Marick that after she told Lawrence that she had turned up the

thermostat, he went to the front room and knocked things over, after which he returned to the kitchen, pulled her hair and struck her. In this statement, Crutchfield said that she retrieved the gun from her pocketbook; that she struggled with Lawrence over the gun; and that Lawrence shot at her and missed. Crutchfield said that after she regained possession of the gun, she attempted to shoot Lawrence in the arm, but instead shot him in the head. Crutchfield told Marick that, at first, she thought Lawrence had feigned injury to get her attention or affection, but then she saw blood and tried to resuscitate him. She said that she called for emergency medical assistance. She also stated that Lawrence had beat her several times and that she was not going to let him beat her again.

After the two statements were taken by Marick, Trooper Lewis asked Crutchfield to consent to a collection of evidence from the house. She refused. Lewis then took Crutchfield to police headquarters to obtain her clothing as evidence. During the trip, Lewis advised Crutchfield of her *Miranda* rights and she gave another statement, wherein she related that she and Lawrence were to go to a car show that day; that he had been away from home all day, but called the residence approximately one hour before the shooting; and that from this conversation she thought he was high and may have been using P.C.P. During this conversation, Crutchfield told Lawrence that she was not going to wait for him but was going to a party. Crutchfield admitted to Lewis that before leaving, she went upstairs and took a .22 caliber revolver from a jewelry box and placed it in her purse, which she then placed on the kitchen table. In response to Lewis's questions, Crutchfield said that she took the pistol with her whenever she went out. According to her statement, Lawrence arrived at the residence before she left and the two argued. She told Lawrence that she had turned up the thermostat to 85 degrees, and that he became angry and "went off like a wild man." In this statement, she said that Lawrence struck her, pulled her hair and knocked her down; that her purse, which had

been on the kitchen table, was knocked to the floor and the pistol came out of it; that she retrieved the gun, the two struggled over it, that it discharged into the air; and that the struggle continued. Lewis testified that in Crutchfield's statement to him, she said that "[s]he stepped back, ... cocked the gun, [and she] described very vividly how she had to cock the pistol, and ... when he lunged at her, she ... fired and shot him." Lawrence fell to the floor, after which Crutchfield said she called for medical assistance.

Crutchfield also told Lewis that at some point during the confrontation, Lawrence had what she thought was a steak knife. In response to Lewis's inquiry as to her state of mind when she shot Lawrence, Crutchfield said that she did not intend to kill him, but only to shoot him in the arm or the leg to slow him down and stop him from beating her. At that point Lewis asked Crutchfield about taking a taped statement. She asked to talk to someone before continuing. She later spoke to her father and thereafter declined to answer any further questions.

Crutchfield was subsequently indicted in the Circuit Court for Carroll County for first degree murder, second degree murder, manslaughter and use of a handgun in the commission of a felony. At a suppression hearing held on September 14, 1987, the court (Gilmore, J.) denied Crutchfield's motion to suppress her statements.

The case was removed to the Circuit Court for Garrett County where a jury trial began on February 29, 1988 before Chief Judge Frederick A. Thayer, III. Crutchfield again moved to suppress the statements she had made to the officers. In reliance on Judge Gilmore's denial of the motion at the earlier suppression hearing, Judge Thayer also denied the motion.

Upon the conclusion of Marick's testimony at the trial, the jury was excused and the trial was recessed. Judge Thayer called counsel into chambers and expressed concern that Crutchfield's statements to Marick had been improper-

ly admitted in evidence. That evening Judge Thayer reviewed the transcript of the suppression hearing before Judge Gilmore, as well as the law governing the admissibility of statements given during custodial interrogation by police. The following morning Judge Thayer declared a mistrial, indicating for the record that Crutchfield neither consented nor objected to the mistrial. He found that Corporal Marick's testimony at trial "demonstrated that there was custodial interrogation of the defendant without prior *Miranda* advice" as to the statements made by Crutchfield to him in the residence and in the patrol car. Judge Thayer recognized from Marick's trial testimony that Judge Gilmore "had some bad information before him." In his *sua sponte* declaration of a mistrial, Judge Thayer said that the "only means of permitting ... [Crutchfield's trial] to begin again afresh" was to take this action, it being his belief that "it now would be a travesty to proceed to a conclusion in this case."

Crutchfield later moved to dismiss the indictment, claiming that the *sua sponte* declaration of the mistrial was not based on manifest necessity and violated the double jeopardy provision of the Constitution. Judge Thayer denied the motion.

Crutchfield filed an immediate appeal from Judge Thayer's order, as authorized by *Neal v. State*, 272 Md. 323, 322 A.2d 887 (1974). The Court of Special Appeals reversed, holding that Crutchfield's retrial was barred by double jeopardy principles because the mistrial was not based upon manifest necessity and Crutchfield did not consent to it. In so holding, the intermediate appellate court first recognized that the trial judge expressed "his belief that the damage done to [Crutchfield's] case by the admission of highly prejudicial evidence that should have been excluded was irreparable." *Crutchfield v. State*, 79 Md.App. 101, 103, 555 A.2d 1070 (1989). It noted that the two statements made to Marick were "extremely damaging to [Crutchfield] because they were inconsistent with her other statements and her self-defense theory of defense [and] had been made

in response to interrogation while ... in custody and before she had been advised of her *Miranda* rights." *Id.* It further said that where a mistrial has been declared *sua sponte* by the trial judge without the defendant's explicit acquiescence, "retrial will not be barred if there was a manifest necessity for the mistrial; however, if the trial was needlessly aborted, retrial will be barred." *Id.* [79 Md.App.] at 105, 555 A.2d 1070. As to this, the court concluded that while "a great deal of deference must be given the trial judge's determination; ... great deference should be given [to the defendant's] determination as to whether his own interests would be better served by aborting the trial or by submitting his fate to the jury that is already impaneled." *Id.* [79 Md.App.] at 107, 555 A.2d 1070. The court held that "except in the most extraordinary circumstances, that decision should be left to the defendant, not the judge." *Id.*

The intermediate appellate court recognized that "the error was the admission of evidence, prejudicial to the defendant, that should have been excluded." *Id.* [79 Md. App.] at 108, 555 A.2d 1070. It queried whether the error was curable "by striking out the evidence and instructing the jury to disregard it." *Id.* [79 Md.App.] at 108, 555 A.2d 1070. In this regard, it said that there is a presumption that a jury can and will follow curative instructions when they are given. At the same time, the court also recognized that "it would be reversible error to admit into evidence an involuntary confession ... with the expectation that a curative instruction will negate the harm." *Id.* [79 Md.App.] at 109, 555 A.2d 1070. Nevertheless, the court reasoned that the trial judge "may not decide as a matter of law, over the defendant's objection or without his consent, that the harm is incurable." *Id.* It explained:

"The defendant may believe that no substantial harm has been done; he may believe that a curative instruction would alleviate the harm; or he may believe that continuing the case before the jury already impanelled, if that jury is properly instructed, is a benefit that would out-

weigh any residual harm. If the defendant declines to move for a mistrial, choosing to continue the case before the impanelled jury, to which a curative instruction has been given, the error in admitting the evidence will not necessitate a reversal; it will be deemed to be either cured or waived." *Id.*

The court concluded its opinion with these words:

"[T]his case is one in which the trial judge, upon concluding that damaging statements which had been admitted into evidence should have been excluded, took it upon himself to declare a mistrial *sua sponte* in order to protect the rights of a defendant who did not seek or consent to that protection. There being nothing in the record indicating a *manifest*, i.e., palpable, evident, obvious, clear, plain, or patent, necessity for the trial judge to have aborted the trial, a retrial of appellant is barred by the Double Jeopardy Clause of the Fifth Amendment...." *Id.* [79 Md.App.] at 109–10, 555 A.2d 1070 (emphasis in original).

We granted certiorari upon the State's petition to determine whether the Court of Special Appeals erred in reversing Judge Thayer's denial of Crutchfield's motion to dismiss the indictment.

## II.

Judge Eldridge, writing for the Court in *Cornish v. State*, 272 Md. 312, 322 A.2d 880 (1974), reviewed relevant Supreme Court cases governing the application of the Fifth Amendment's double jeopardy clause to a retrial following the declaration of a mistrial. *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), the seminal Supreme Court decision in this regard, explained [22 U.S. (9 Wheat)] at 580:

"[I]n all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, *there is a manifest necessity for the act, or the ends of public justice would*

*otherwise be defeated.* They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.... [Courts] have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." (Emphasis supplied.)

*See also Richardson v. United States,* 468 U.S. 317, 323–34, 104 S.Ct. 3081, 3084–91, 82 L.Ed.2d 242 (1984); *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *Arizona v. Washington,* 434 U.S. 497, 505–06, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *Illinois v. Somerville,* 410 U.S. 458, 461–62, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973); *Cornish v. State, supra,* 272 Md. at 316–17, 322 A.2d 880. In *Arizona v. Washington, supra,* 434 U.S. at 506, 98 S.Ct. at 830, the Supreme Court said that the

"classic formulation of the [manifest necessity] test has been quoted over and over again to provide guidance in the decision of a wide variety of cases. Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate."

The Supreme Court has not fashioned any hard and fast rules for determining when manifest necessity exists; rather, it has "explicitly declined the invitations of litigants to formulate rules based on categories of circumstances which will permit or preclude retrial." *U.S. v. Jorn,* 400 U.S. 470, 480, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). Additionally,

the manifest necessity standard "abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial." *Illinois v. Somerville, supra,* 410 U.S. at 462, 93 S.Ct. at 1069.

We recognized in *Cornish,* 272 Md. at 318, 322 A.2d 880, that the Supreme Court has established broad principles to be followed in determining whether there was manifest necessity for a mistrial. *See also Jourdan v. State,* 275 Md. 495, 510, 341 A.2d 388 (1975). At one extreme are the mistrials that are not based upon manifest necessity and have been declared to give prosecutors an unfair advantage over the defendant. *Arizona v. Washington, supra,* 434 U.S. at 507–08, 98 S.Ct. at 831; *In Re Mark R.,* 294 Md. 244, 250–51, 449 A.2d 393 (1982). At the other extreme is the hung jury, considered to be the classic example of what constitutes manifest necessity for a mistrial. *See Arizona v. Washington, supra,* 434 U.S. at 509, 98 S.Ct. at 832; *In Re Mark R.,* 294 Md. at 250–51, 449 A.2d 393; *see also, e.g., Keerl v. Montana,* 213 U.S. 135, 29 S.Ct. 469, 53 L.Ed. 734 (1909); *Dreyer v. Illinois,* 187 U.S. 71, 23 S.Ct. 28, 47 L.Ed. 79 (1902); *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); *United States v. Perez, supra,* 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165.

■ There is a wealth of case law that has fleshed out the spectrum between these two extremes. Manifest necessity exists where there has been a procedural error in the proceedings which would necessitate a reversal on appeal. *Illinois v. Somerville, supra,* 410 U.S. at 464, 93 S.Ct. at 1070. The Supreme Court has also found manifest necessity for a mistrial where a juror has possibly been biased or the juror's impartiality is questionable. *Thompson v. United States,* 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894) (one of the trial jurors served on the grand jury that indicted the defendant); *Simmons v. United States,* 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891) (possible juror bias as result of a newspaper article about a letter written by defense counsel which denied that one of the jurors was acquainted

with the defendant). Manifest necessity does not exist where a prosecution witness is absent or where the mistrial is declared "so as to afford the prosecution a more favorable opportunity to convict...." *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963). In *Jourdan v. State, supra,* we held that there was no manifest necessity for a *sua sponte* declaration of a mistrial where the prosecuting attorney became ill during the trial and a short continuance until another prosecutor could become prepared was a feasible alternative. Nor does manifest necessity for a mistrial exist where the State's witness could not communicate in the English language and a short continuance to obtain an interpreter would have solved the problem.[2] *In Re Mark R., supra.*

 In this case, it was the improper admission of highly damaging evidence that prompted Judge Thayer to declare a mistrial. A brief analysis of the cases where prejudicial evidence was improperly admitted, or counsel made improper remarks or arguments, demonstrates that the case before us is well within the category of cases in which a mistrial is manifestly necessary.

In *Arizona v. Washington, supra,* defense counsel made improper remarks in his opening statement to the jury regarding evidence that the prosecutor withheld from the defendant. The Supreme Court began its analysis "from the premise that defense counsel's comment was improper and *may* have affected the impartiality of the jury." 434 U.S. at 511, 98 S.Ct. at 833 (emphasis supplied). It "recogniz[ed] that the extent of possible bias cannot be measured," and that it was entirely possible "that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions." *Id.* Continuing, the Court said that

> "[i]n a strict, literal sense, the mistrial was not 'necessary.' Nevertheless, the overriding interest in the even-

---

**2.** For cases relating the history of the manifest necessity standard, *see Cornish, supra,* 272 Md. at 316–20, 322 A.2d 880.

handed administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." *Id.*

In the instant case, the improperly admitted statements likely had a more severe impact upon the jury than the improper comment made to the jury in *Arizona v. Washington.* Here, as in that case, the "highest degree of respect" must be given to Judge Thayer's evaluation of the effect of the improperly admitted statements upon the jury.

In *Cornish,* we held that manifest necessity for a mistrial existed where the prosecutor made a prejudicial remark during a nonjury murder trial (which the judge concluded would be very difficult for her to disregard) and the trial judge concluded that a continuance would not be practical.

In *Neal v. State, supra,* we affirmed the circuit court's denial of a motion to dismiss a warrant charging the defendant with shoplifting. There, a mistrial was declared because articles allegedly stolen by the defendant, which were suppressed as fruits of a warrantless search, were within sight of the jury for the entire trial and were repeatedly referred to throughout the trial.

Courts in other states have found manifest necessity for *sua sponte* mistrials in similar cases. The Supreme Court of Delaware, in *Bailey v. State,* 521 A.2d 1069 (Del.1987), found manifest necessity to exist in a trial judge's *sua sponte* declaration of a mistrial where prosecution witnesses referred to the defendant's prior trial on the same charges and a third prosecution witness referred to the prior trial and the resulting conviction. In an earlier case, *Rentoul v. State,* 301 A.2d 284 (Del.1973), the court also found manifest necessity for a mistrial where the prosecutor and defense counsel made improper remarks in their opening statements. The trial judge, *sua sponte,* declared a mistrial after the prosecutor stated that a blood alcohol test could not be introduced as evidence because it was

defective as the result of an insufficient breath sample, and defense counsel alleged that exculpatory evidence was being suppressed by the state.

In *Abdi v. State*, 249 Ga. 827, 294 S.E.2d 506 (1982), the court found manifest necessity for a mistrial in a rape case when defense counsel questioned the complaining witness regarding her sexual experience. The prosecutor objected to the question under the Georgia "shield law" and moved that defense counsel be rebuked, at which time the trial judge, *sua sponte*, declared a mistrial without objection from the defendant.

Manifest necessity for a mistrial was found by the court in *State v. Brady*, 120 N.H. 899, 424 A.2d 407 (1980). In that case the trial judge declared a *sua sponte* mistrial after finding one of the defendants in contempt of court for stating "that the trial was 'reminiscent of a kangaroo court.'" *Id.* 424 A.2d at 408–09. The appellate court thought the trial judge's discretion was properly exercised because the defendant's "obvious hostility to the judge's rulings could not help but influence the jury." *Id.* 424 A.2d at 409.

In *State v. Blanks*, 190 N.J.Super. 269, 463 A.2d 359 (1983), the court held that the trial judge had correctly declared a mistrial based on manifest necessity where a witness who had allegedly participated in the crime with the defendant stated that he had been found not guilty in a prior separate trial. There, the trial judge concluded that a curative instruction would be insufficient.

Courts that have not found manifest necessity for *sua sponte* mistrials have had very different facts before them. In *People v. Benton*, 402 Mich. 47, 260 N.W.2d 77 (1977), the court held that there was no manifest necessity for the declaration of a mistrial where the prosecutor improperly impeached his own witness who allegedly was an accomplice of the defendant in an armed robbery. In *Klinefelter v. Superior Court, County of Maricopa*, 108 Ariz. 494, 502 P.2d 531 (1972), the court held that there was no manifest

necessity for the declaration of a mistrial in an aggravated battery case because a rebuttal witness twice referred to information which had been excluded as improper rebuttal testimony. In *Espinoza v. District Court In & For County of Conejos,* 180 Colo. 391, 506 P.2d 131 (1973), the court held that there was no manifest necessity for a *sua sponte* mistrial over the prosecutor's objection where the defense attorney's cross-examination of an alleged rape victim and closing argument before a jury, were "either completely proper or involved at most only minor improprieties." *Id.* 506 P.2d at 134. In *District of Columbia v. I.P.,* 335 A.2d 224 (D.C.1975), the court found no manifest necessity for a *sua sponte* mistrial where the trial judge recused himself because he believed that the prosecutor was attempting to withhold evidence.

In *Jones v. State,* 17 Md.App. 504, 302 A.2d 638 (1973), the court found no manifest necessity for the declaration of a mistrial merely because the trial judge believed he had incorrectly admitted evidence that an armed robbery suspect's victim was a drug dealer.

### III.

We held in *Cornish,* 272 Md. at 320, 322 A.2d 880, that "a retrial is barred by the Fifth Amendment where reasonable alternatives to a mistrial, such as a continuance, are feasible and could cure the problem." We also stated in *Neal v. State, supra,* 272 Md. at 326, 322 A.2d 887, that "[t]he trial judge's function is to see that the defendant has a fair trial. Once he perceives that the trial cannot proceed because of prejudice to the defendant, he has no choice but to declare a mistrial."

■ Crutchfield argues that there were alternatives to a mistrial that Judge Thayer should have considered, mainly to strike the inadmissible evidence, give a curative instruction to the jury, and afford her the choice of either accepting the instruction or the mistrial. In the circumstances of this case, we think Judge Thayer was entitled to and did

exercise sound discretion in rejecting this and other alternatives now suggested by Crutchfield. As the Supreme Court said in *Illinois v. Somerville, supra,* 410 U.S. at 464, 93 S.Ct. at 1070:

"A trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial. If an error would make reversal on appeal a certainty, it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court. This was substantially the situation in both *Thompson v. United States,* [155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894)] and *Lovato v. New Mexico,* [242 U.S. 199, 37 S.Ct. 107, 61 L.Ed. 244 (1916)]."

As earlier indicated, the Court of Special Appeals recognized that it would be reversible error to admit Crutchfield's statements to Marick into evidence with the expectation that a curative instruction would negate the harm. 79 Md.App. at 109, 555 A.2d 1070. It nevertheless concluded, against the relevant case authority, that it was for the defendant, and not the trial judge, to make the ultimate determination of manifest necessity for a mistrial, including whether a curative instruction would alleviate the harm done by the improperly admitted evidence of Crutchfield's guilt. In so holding, the court in effect rendered the trial judge a useless appendage in the judgmental process of determining whether a mistrial was manifestly necessary in the interest of public justice. That Crutchfield may have been receptive to a curative instruction and thereby would possibly waive the evidentiary error on appeal if she was convicted, does not circumscribe the traditional power vested in the trial judge to declare, *sua sponte,* whether a mistrial must be granted on the basis of manifest necessity. And this is so without regard to the defendant's acquiescence or objection. In other words, the public interest is

not served by rendering a trial judge powerless to act where a defendant, knowing that reversible error has been committed during the trial, does not consent to the mistrial, being secure in the belief that if the jury returns a verdict of guilty, the conviction will in any event be reversed on appeal. To permit such a result would fly in the face of *Illinois v. Somerville, supra* and would not accord "the highest degree of respect" to the trial judge's evaluation of the manifest need for a mistrial, as required by *Arizona v. Washington,* 434 U.S. at 511, 98 S.Ct. at 833. As the latter case states, 434 U.S. at 512–13, 98 S.Ct. at 833–34:

> "The trial judge, of course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline counsel, or even remove him from the trial as he did in *United States v. Dinitz,* 424 U.S. 600 [96 S.Ct. 1075, 47 L.Ed.2d 267 (1976)]. Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases."

Judge Thayer explained his reasons for declaring the mistrial on the record. Although he did not make a specific finding of manifest necessity, the failure to do so does not render his declaration of the mistrial constitutionally defective. *Arizona v. Washington, supra,* 434 U.S. at 517, 98 S.Ct. at 836. From our review of the record, it is evident that Judge Thayer did not err in declaring the mistrial in this case. In our view, Judge Thayer proceeded in accordance with the formulation given in *United States v. Perez, supra,* 22 U.S. at 580, namely, in evaluating the manifest need for the mistrial, he proceeded with "the greatest caution, under urgent circumstances, and for very plain and obvious causes."

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR GARRETT COUNTY FOR REIN-

216

STATEMENT OF THE INDICTMENT AND FOR TRIAL CONSISTENT WITH THE VIEWS EXPRESSED IN THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY APPELLEE.