*State of Maryland v. Andrew Daniel Baker*, No. 55, September Term, 2016.  Opinion by Getty, J.

**CRIMINAL LAW & PROCEDURE — FIFTH AMENDMENT — DOUBLE JEOPARDY — MANIFEST NECESSITY**

Trial court abused its discretion by declaring *sua sponte* mistrial over defendant's objection after learning that State's key witness, who was refusing to testify, was represented in a related pending criminal case by the prosecutor's brother, a public defender.  Mistrial was not supported by manifest necessity where trial court failed to consider, on the record, whether reasonable alternatives to a mistrial existed and were feasible.  Therefore, retrial of defendant is barred by double jeopardy principles.

Circuit Court for Cecil County
Case Nos. 07-K-15-000189; 07-K-15-000640
Argued: February 2, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 55

September Term, 2016

_____

STATE OF MARYLAND

v.

ANDREW DANIEL BAKER

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.
Barbera, C.J., and Adkins, J., dissent.

_____

Filed: May 22, 2017

This appeal involves a mutual shoot-out between rivals, competing criminal cases arising from separate alleged assaults between those rivals, and a prosecutor who learns during trial of a potential conflict of interest, because his key witness is represented by the prosecutor's brother, a public defender, in the competing criminal case. First, Darrell Ellis filed criminal charges against the Respondent, Andrew Daniel Baker, for an incident that occurred on January 13, 2015, where neighbors reported shots being fired both into and from within a residence in Elkton, Maryland ("the First Incident"). In exchange, Mr. Baker filed criminal charges against Mr. Ellis for an alleged assault that occurred on January 15, 2015 ("the Second Incident"). At Mr. Baker's trial for allegedly assaulting Mr. Ellis and his girlfriend, Kimberly Mitchell, during the First Incident, it was revealed that Mr. Ellis' defense counsel for the charges related to the Second Incident was the brother of the assistant state's attorney who was prosecuting Mr. Baker for the charges stemming from the First Incident. When the trial court learned this information, it declared a mistrial over Mr. Baker's objection.

Mr. Baker subsequently filed a motion to dismiss his indictments on grounds of double jeopardy, which was denied. Mr. Baker noted an interlocutory appeal to the Court of Special Appeals, which reversed the decision of the lower court and ordered the indictments be dismissed. The State then petitioned this Court for a writ of certiorari, requesting that we review whether the mistrial was supported by manifest necessity.

For the following reasons, we shall hold that the trial court's declaration of a mistrial over Mr. Baker's objection was not supported by manifest necessity, and thus the mistrial amounted to an abuse of discretion. Therefore, retrial of Mr. Baker is barred by double

jeopardy principles, and the circuit court erred in denying Mr. Baker's motion to dismiss the indictments. Accordingly, we shall affirm the judgment of the Court of Special Appeals.

## BACKGROUND

### A.  *The Charges*

On January 13, 2015, police officers responded to reports of gun fire at a residence in Elkton, Maryland. Neighbors reported that gunshots were coming from inside the residence, and, at the same, a suspect on the outside was shooting into the residence.[1] Upon entering the residence, the police found Mr. Baker and three other individuals hiding in a bedroom. The police officers located a shotgun under the bed and ammunition throughout the house. Following an investigation, the police learned that Mr. Baker had previously been convicted of a disqualifying offense, and therefore was prohibited from possessing firearms and ammunition. Accordingly, on January 14, 2015, the police filed a statement of charges against Mr. Baker for illegal possession of a firearm and ammunition. On February 4, 2015, the State charged Mr. Baker, by indictment, with possession of a firearm

---

[1] Although it is not entirely clear from the abbreviated record in this case, we infer that Mr. Ellis was the suspect reportedly shooting into the residence where the police found Mr. Baker. At Mr. Baker's trial, defense counsel asserted that it was the State's theory of the case "that this was a mutual shoot-out." Mr. Ellis was not charged in connection with this incident.

after having been convicted of a crime of violence[2] and possession of a firearm after being convicted of a disqualifying offense.[3]

On March 11, 2015, Mr. Ellis filed an application for statement of charges against Mr. Baker regarding the incident that occurred on January 13. Mr. Ellis alleged that Mr. Baker "shot his gun out the window at me an[d] my girlfriend because of something my cousin did to him." On April 15, 2015, the State charged Mr. Baker in a separate case with first- and second-degree assault against Mr. Ellis, and first- and second-degree assault against Ms. Mitchell. The State then filed a motion to consolidate this latter case with the illegal possession of a firearm case for trial, which the circuit court granted on July 10, 2015.

On the same day that Mr. Ellis filed charges against Mr. Baker, Mr. Baker also filed an application for statement of charges against Mr. Ellis. Mr. Baker alleged that Mr. Ellis had assaulted him on January 15, 2015—two days after the First Incident.[4] Based on this allegation, the State charged Mr. Ellis with second-degree assault and reckless endangerment against Mr. Baker.

**B.    *Trial Proceedings***

Mr. Baker's consolidated trial on the illegal firearm possession charges and the assault charges began on July 22, 2015, in the Circuit Court for Cecil County, Judge Brenda

---

[2] Maryland Code, Public Safety Article ("PS") § 5-133(c).

[3] PS § 5-133(b).

[4] The record does not provide any further details regarding the nature of this alleged assault.

A. Sexton presiding. The Assistant State's Attorney prosecuting the case was Karl Fockler ("ASA Fockler"), and Mr. Baker was represented by Michael Halter as a Panel Assistant Public Defender. At the outset of proceedings, ASA Fockler informed the court that he had spoken to Mr. Ellis and Ms. Mitchell two days earlier to ensure that they knew about the court date and had been properly served with their subpoenas. The morning of the trial, ASA Fockler spoke to Mr. Ellis around 9:00 a.m. and Mr. Ellis stated that "he would be on his way in shortly." Following that conversation, a detective informed ASA Fockler that Mr. Ellis told the detective "that he had been threatened in some form as to not appear in court," and that he was not coming in. Upon learning this information, ASA Fockler asked the court to issue body attachments for both Mr. Ellis and Ms. Mitchell. Defense counsel did not oppose ASA Fockler's request. The circuit court then stated that it would issue the body attachments, and the court recessed at 10:35 a.m.

The court reconvened at 11:49 a.m. At that time, both parties indicated that they anticipated that the trial would last "into tomorrow." The court then noted that during the recess ASA Fockler had asked the court not to issue the body attachments for Mr. Ellis and Ms. Mitchell. ASA Fockler confirmed that he had made this request, and stated that Mr. Ellis and Ms. Mitchell had "appeared to the State's Attorney's Office." ASA Fockler also stated that he had met with Mr. Ellis and Ms. Mitchell "and verified their presence here this morning." Following this statement, the circuit court began the jury selection process by calling roll and conducting voir dire. After the jury was impanelled[5] and sworn, the

---

[5] While there are four recognized spellings of the word "impanelled," (impanelled, impaneled, empanelled, and empaneled), this opinion uses the same spelling that is used

court asked both parties if there were any other preliminary matters that needed to be addressed. Both parties responded in the negative, and the court took another recess at 1:47 p.m.

The court reconvened at 3:04 p.m. without the jury present. At that time, the court stated that ASA Fockler had presented a motion to compel testimony during the recess. Defense counsel confirmed that he had received the motion to compel approximately ten minutes earlier. In the motion to compel, ASA Fockler averred that Mr. Ellis "is a material State witness and victim" in the case, that he had "provided substantive, material information which is to be presented at trial," and that Mr. Ellis' testimony "is necessary to and furthers the public interest." Futhermore, ASA Fockler averred that "on the **morning** of July 22, 2015," i.e. the day of trial, Mr. Ellis advised ASA Fockler "that he intends to refuse to testify and to invoke his Fifth Amendment Privilege against self[-]incrimination." (Emphasis added.) Finally, ASA Fockler averred "[t]hat the State has agreed to offer [Mr.] Ellis immunity from prosecution in relation to any information directly or indirectly derived from the testimony of [Mr.] Ellis and related to the above[-]captioned matter." ASA Fockler did not explain to the court why he waited until

---

throughout Maryland Rule 2-512, regarding jury selection. *See, e.g.*, Md. Rule 2-512(f)(1) ("The individuals to be **impanelled** as sworn jurors, including any alternates, shall be called from the qualified jurors remaining on the jury list in the order previously designated by the trial judge and shall be sworn." (emphasis added)). However, when quoting other sources using an alternate spelling of "impanelled," this opinion retains the alternate spelling.

5

after the jury had been selected to inform the court and defense counsel of Mr. Ellis' refusal to testify.

Defense counsel objected to the motion, stating that it was in violation of Maryland Rule 4-263[6] and "extremely prejudicial to the defense." The court heard argument from both parties, then announced its ruling as follows:

> I would like to proceed by way of calling Mr. Ellis into the courtroom. I would like to indicate to him that it is my intention to deal with this motion, advise him that the state's attorney is offering him immunity, and that he is required to testify in this matter.

Defense counsel again noted his objection for the record. Defense counsel then indicated that he intended to cross-examine Mr. Ellis regarding his pending charges related to the Second Incident, "because it shows a pattern, it shows a state of mind and an association between [Mr. Baker] and Mr. Ellis." Furthermore, defense counsel requested "that someone call the Public Defender's Office," because it was his understanding that Mr. Ellis' defense attorney for his pending charges related to the Second Incident was E.B. Fockler ("PD Fockler"), ASA Fockler's brother. Immediately following this revelation, the court took a recess at 3:16 p.m.

The court reconvened at 4:01 p.m. without the jury present. The court recounted for the record that ASA Fockler had filed a motion to compel Mr. Ellis' testimony, and he intended to offer Mr. Ellis immunity in connection with that testimony; that Mr. Ellis had

---

[6] Maryland Rule 4-263 governs discovery procedures in criminal cases in the circuit courts.

criminal charges pending against him, which were filed by Mr. Baker; and that Mr. Ellis was being represented by PD Fockler, ASA Fockler's brother. The court then stated,

> In light of these facts and circumstances, I do not believe it is possible for me to continue in this matter, for us to continue this trial. I do not think that I can conduct a hearing and/or permit the testimony of Mr. Ellis accompanied by his attorney being offered immunity when his attorney is the brother of the state's attorney.
>
> In light of that, I am going to call the members of the jury panel back in, I am going to declare a mistrial, and I am going to excuse them. Thereafter, I will deal with [ASA] Fockler, or actually the state's attorney's office and [defense counsel] with regard to rescheduling this matter.

Defense counsel objected to the mistrial. The court then reiterated,

> Again, as I've indicated, I did speak to counsel in chambers so that the record is clear. I indicated that I do not see how I can proceed at this time given these circumstances.
>
> I am going to call the jury back in. I'm going to advise them that an issue has come up, that it cannot be resolved, it's through no fault of anyone, but I'm declaring a mistrial and they are excused.

The bailiff then brought the jury back into the courtroom. The court told the jurors,

> [T]here has been an issue that has arisen that we have been unable to resolve. It is through no fault of any of the parties here today. However, in connection with this matter I feel that I am compelled to declare a mistrial, so your service in this matter will be over today.
>
> After dismissing the jury, the court stated that during the previous forty-five-minute

recess it had asked the parties to "go upstairs to reset this matter." Next, the court asked

ASA Fockler if he would be continuing with the case:

> THE COURT: Mr. Fockler, I understand that you, sir, may not be continuing with this matter. Is that correct?
>
> [ASA] FOCKLER: You mean as the prosecutor for this case?
>
> THE COURT: Yes, sir.

7

[ASA] FOCKLER: I don't know that that's necessarily—I mean, I'm not sure how that's going to be handled, Judge. We haven't figured that part out.

After discussing possible dates for the new trial, the court again questioned ASA Fockler:

THE COURT: Mr. Fockler, how are you going to resolve this issue for the next trial date?

[ASA] FOCKLER: I don't know, Judge, but we're going to have to figure that out.

THE COURT: Okay. Someone else in your office will be able to proceed?

[ASA] FOCKLER: I'm going to go back and we're going to discuss it and see what we can do for that to occur, Judge.

Shortly after this exchange, the court adjourned.

## C.    *The Motion to Dismiss*

On July 31, 2015, Mr. Baker filed a Motion to Dismiss Indictment Based Upon Double Jeopardy Grounds. In his motion to dismiss, Mr. Baker recounted some of the discussion that occurred in the judge's chambers during the afternoon recess on July 22:

The judge expressed her concern that [PD] Fockler would be advising Mr. Ellis about his right to remain silent, since [PD] Fockler is the brother of [ASA] Fockler, the prosecutor in this matter. The judge felt that this would be a conflict of interest or at least appear to be a conflict of interest. Brief discussion was had regarding the possibility of contacting another attorney from the Office of the Public Defender to advise Mr. Ellis but this ultimately was not done. The judge expressed her concern over continuing the matter to the next day in order to contact someone to advise Mr. Ellis. The judge stated that she saw no alternative but to declare a mistrial.

(Numbering and paragraph breaks omitted.) Mr. Baker argued that the court did not find manifest necessity to declare a mistrial, and did not explore reasonable alternatives to declaring a mistrial. Therefore, Mr. Baker concluded that the court should dismiss both indictments against him (the illegal firearm possession charges and the assault charges)

8

based on a violation of his Fifth Amendment right against double jeopardy. The State did not file a response to Mr. Baker's motion to dismiss.

Judge Sexton, the same judge that presided over Mr. Baker's trial, held a hearing on the motion to dismiss on August 28, 2015. At the hearing, defense counsel recounted the circumstances culminating in the declaration of a mistrial on July 22. Specifically, defense counsel recounted the discussion that occurred in the judge's chambers during the afternoon recess:

> [DEFENSE COUNSEL]: It was in chambers that the Court stated off the record that you did not believe that it was proper, based on the familial relationship between [PD] Fockler and [ASA] Fockler, the prosecutor in this matter, that [PD] Fockler be permitted to come over to advise Mr. Ellis of his right not to testify, again, based on the fact that, not necessarily being a conflict of interest but just the appearance of a conflict of interest in front of the jury. It was at that point that the [c]ourt told counsel—
>
> THE COURT: I'm going to interrupt you, Mr. Halter, because I believe the [c]ourt finds it to be a conflict.
>
> [DEFENSE COUNSEL]: I'm sorry, Your Honor. That was a presumption I should not have made then. I thought the [c]ourt was more going on an appearance of conflict. But again, that being said, the [c]ourt deemed it to be a conflict, again, at that time and obviously still does today. It was at that point that the [c]ourt noted to us in chambers that you did not see an alternative to a mistrial, and a mistrial was declared on the record over the objection of counsel, over the objection of defense counsel, which again, is a crucial point, a very crucial point.

Defense counsel argued that "there were at least two other alternatives to a mistrial" that the court did not explore. First, defense counsel suggested that the court could have called the Public Defender's Office and inquired whether it could send over another public defender, other than PD Fockler, to advise Mr. Ellis of his right not to testify in Mr. Baker's trial. Second, defense counsel suggested that the court could have dismissed the jury for

9

the day, and made arrangements with the Public Defender's Office to send over another

public defender to advise Mr. Ellis the next day.[7]

Also at the hearing on the motion to dismiss, ASA Fockler recounted the events

preceding the declaration of a mistrial:

> We had gone in chambers, as [defense counsel] had stated, and we had sat
> and we scratched our collective heads as to what alternatives there might be
> in order to remedy this particular problem. And I think it was essentially
> determined that the [c]ourt was not in a position to go out and lawyer-shop
> for Mr. Ellis as that would certainly be inappropriate. There really weren't
> any alternatives without the [c]ourt possibly doing that. And the [c]ourt,
> again, I think due to, again, this being a highly unusual situation, there needed
> to be something to be done immediately, a jury had just been sworn in and
> selected, and that there was an urgent circumstance before, quite frankly, the
> trial could even begin.

ASA Fockler responded to defense counsel's suggested alternatives to a mistrial by

explaining that even if another public defender had been available to advise Mr. Ellis of

his right not to testify, that would not have resolved the conflict of interest created by ASA

Fockler offering immunity to Mr. Ellis, who was his brother's client in another pending

matter.

After hearing argument from both parties, the court announced its ruling:

> In light of the fact that [PD] Fockler had been assigned to and represented
> Mr. Ellis, I found that it was not proper for me to assign to Mr. Ellis a new
> attorney, to appoint a different attorney for him for purposes of advisement
> with regard to this. Specifically he has the right to have his own counsel
> represent him. And additionally, this matter involved the same parties as the
> other. And I did not think it was proper for the [c]ourt to advise Mr. Ellis

---

[7] Defense counsel also suggested that the court could have called the Public Defender's
Office to see if PD Fockler himself was available to advise Mr. Ellis, indicating that he did
not agree with the court's conclusion that PD Fockler's representation of Mr. Ellis in the
other matter created a conflict of interest.

that he had to rely on the advi[c]e of another attorney chosen by the Public Defender's Office without the benefit of his counsel who was representing him in the other matter.

The [c]ourt certainly believed that the charges relating to January 15, 2015, filed against Mr. Ellis would have been brought out, either they may have been subject to the immunity and/or that they would be subject to cross-examination.

Based on the fact that the [c]ourt did not believe it appropriate to randomly assign a public defender other than [PD] Fockler to Mr. Ellis to advise him with regard to his Fifth Amendment privileges, advise him with regard to the possible consequences of immunity, I found no reasonable alternatives available at the time. The [c]ourt believed there was a manifest necessity to grant the mistrial. And in light of those findings, the [c]ourt is going to deny defendant's motion today.

On the same day that the circuit court issued its ruling, Mr. Baker filed a notice of appeal to the Court of Special Appeals, and a motion to stay proceedings pending appeal. The circuit court granted the stay pending the interlocutory appeal.

The Court of Special Appeals reversed the circuit court's denial of the motion to dismiss in an unreported opinion filed on August 4, 2016. *Baker v. State*, No. 1467, Sept. Term, 2015, 2016 WL 4158892 (Md. Ct. Spec. App. Aug. 4, 2016). The State petitioned this Court for a writ of certiorari, which this Court granted on October 12, 2016. *State v. Baker*, 450 Md. 216 (2016). The State presents the following questions for our review:

1. Did the Court of Special Appeals err in concluding that the trial court failed to articulate sufficiently the basis for its determination of manifest necessity?

2. Did the trial court properly exercise its discretion in finding manifest necessity to declare a mistrial?

**STANDARD OF REVIEW**

11

"[W]e review the trial judge's grant of a mistrial for abuse of discretion." *Simmons v. State*, 436 Md. 202, 212 (2013) (citing *Arizona v. Washington*, 434 U.S. 497, 514 (1978)). "It is well-settled that a decision to grant a mistrial lies within the sound discretion of the trial judge and that the trial judge's determination will not be disturbed on appeal unless there is abuse of discretion." *Id.* (quoting *Carter v. State*, 366 Md. 574, 589 (2001)). "That is, we look to whether the trial judge's exercise of discretion was 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id.* (quoting *Stabb v. State*, 423 Md. 454, 465 (2011)).

## DISCUSSION

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb." The constitutional prohibition on double jeopardy applies to the States through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794 (1969).[8] "In a jury trial, the Double Jeopardy Clause generally bars the retrial of a criminal defendant for the same offense once a jury has been empaneled and sworn." *Simmons*, 436 Md. at 213. "When a mistrial is granted over the objection of the defendant, double jeopardy principles will not bar a retrial if there exists 'manifest necessity' for the mistrial." *Id.* If, however, the mistrial was not

---

[8] "Maryland common law double jeopardy principles also 'protect an accused against twice being put in jeopardy for the same offense.'" *State v. Woodson*, 338 Md. 322, 328 (1995) (quoting *Gianiny v. State*, 320 Md. 337, 342 (1990)). However, Mr. Baker has not argued that the double jeopardy prohibition under Maryland common law sweeps more broadly than that under the federal Constitution. Therefore, this opinion focuses solely on constitutional double jeopardy principles, as interpreted by both Maryland courts and the United States Supreme Court.

12

manifestly necessary, then the trial judge abused her discretion in declaring the mistrial, and retrial is barred by double jeopardy principles. *Hubbard v. State*, 395 Md. 73, 89 (2006).

> Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

*Washington*, 434 U.S. at 505 (footnote omitted).

"The words 'manifest necessity' appropriately characterize the magnitude of the prosecutor's burden," but "those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Id.* at 505–06. Indeed, "necessity" is not to be interpreted literally; instead "we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Id.* at 506.

> Whether manifest necessity to declare a mistrial and, thus, whether the prohibition of the double jeopardy clause is triggered depend upon the unique facts and circumstances of each case. While it is in the sound discretion of the trial judge to declare a mistrial, he or she may do so only if a 'high degree' of necessity demands that he or she do so.

*Mansfield v. State*, 422 Md. 269, 287 (2011) (citations omitted).

13

In addition to this "high degree of necessity," another component of the manifest necessity determination is a finding by the trial court that no reasonable alternatives to a mistrial were actually available.

> Thus, to determine whether manifest necessity to declare a mistrial over defense objection exists, the trial judge must engage in the process of exploring reasonable alternatives and determine that there is no reasonable alternative to the mistrial. . . . [A]pplication of this standard in manifest necessity cases does not only consider whether alternatives were analyzed, but also goes to whether a reasonable alternative to a mistrial was available. If there was no reasonable alternative, ordinarily the mistrial is manifestly necessary, and retrial is not barred by double jeopardy principles. If there is a reasonable alternative, the mistrial is not manifestly necessary, and a defendant cannot be retried. Any doubt should be resolved in favor of the defendant.

*Hubbard*, 395 Md. at 92–93; *see also State v. Hart*, 449 Md. 246, 278 (2016) ("Prior to the declaration of a mistrial, the trial court was obliged to explore reasonable alternatives.").

In summary, there exists "manifest necessity" for a mistrial only if 1) there was a "high degree" of necessity for the mistrial; 2) the trial court engaged "in the process of exploring reasonable alternatives" to a mistrial and determined that none was available; and 3) no reasonable alternative to a mistrial was, in fact, available.

"[R]eviewing courts have an obligation to satisfy themselves that . . . the trial judge exercised 'sound discretion' in declaring a mistrial." *Washington*, 434 U.S. at 514. However, "[t]he absence of an explicit finding of 'manifest necessity' . . . does not render [the trial court's ruling] constitutionally defective." *Id.* at 516–17. Instead, the reviewing court must be "persuaded by the record that the trial judge acted responsibly and deliberately, and accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." *Id.* at 516.

14

In the instant case, the parties do not dispute that the jury had been impanelled and sworn prior to the circuit court's *sua sponte* declaration of a mistrial, and therefore jeopardy had attached. Furthermore, the parties do not dispute that the mistrial was declared over the defendant's objection. Therefore, the issue before this Court is whether the mistrial was supported by manifest necessity.

Before we can answer that question, however, we must first resolve a preliminary issue raised by the State. The State contends that although the Court of Special Appeals acknowledged some of the circuit court's findings made at the hearing on the motion to dismiss, the intermediate appellate court "did not clarify whether it considered the motions hearing to be part of the record from which appellate review could be appropriately conducted." The State urges this Court to clarify that a reviewing court may consider "the entire record," including a subsequent hearing on a motion to dismiss, to determine whether the trial court's mistrial declaration was supported by manifest necessity.

Mr. Baker rejects the State's contention that the Court of Special Appeals did not consider the entire record in reaching its conclusion that the circuit court abused its discretion, noting that the intermediate appellate court referenced in its analysis the circuit court's rulings at the motions hearing. However, Mr. Baker agrees with the State that a reviewing court should take into account both the record of the trial, and the record of any subsequent proceeding at which the lower court is asked to determine whether retrial is barred by double jeopardy, in order to determine whether the mistrial was supported by manifest necessity.

Although this Court has not explicitly stated that a reviewing court may look to the record of subsequent proceedings in order to determine whether the mistrial was supported by manifest necessity, the Court has indicated that such review may be appropriate in some cases. For example, in *Mansfield*, we summarized both the trial court's mistrial declaration, as well as the motions court's subsequent ruling on the defendant's motion to dismiss, before concluding that the mistrial was not supported by manifest necessity. *See Mansfield*, 422 Md. at 278–79. Similarly, in *Jourdan v. State*, we reviewed both the trial proceedings culminating in a mistrial and the subsequent proceedings on the defendant's postconviction petition, which alleged that his second trial violated the Double Jeopardy Clause, because the postconviction proceedings provided greater detail on the events precipitating the mistrial declaration. *See Jourdan v. State*, 275 Md. 495, 498–505 (1975).

In this case, the record of the hearing on Mr. Baker's motion to dismiss also provides greater detail on the events precipitating the circuit court's mistrial declaration because, at the motions hearing, defense counsel, ASA Fockler, and the trial judge all offered their recollection of the events culminating in the mistrial. Furthermore, we note that, in this case, the same judge presided over Mr. Baker's trial and the hearing on the motion to dismiss, so the judge's comments at the motions hearing explaining her mistrial ruling provide particular insight into whether that ruling was supported by manifest necessity. Therefore, we shall review the record of both the trial and the subsequent hearing on Mr. Baker's motion to dismiss in order to determine whether the mistrial was supported by manifest necessity.

16

Turning now to the underlying issue, the Court of Special Appeals held "that the trial court abused its discretion by declaring a mistrial without a sufficient basis to support a manifest necessity determination." *Baker*, 2016 WL 4158892, at *5. The intermediate appellate court noted that "[t]he trial record is void of an explicit 'manifest necessity' determination." *Id.* "More significant than the absence of the words 'manifest necessity,' however, was the absence of a sufficient analysis to support the determination that there was no reasonable alternative [to a mistrial]." *Id.*

The State argues that the Court of Special Appeals placed too much emphasis on the circuit court's failure to utter the "two magic words"—manifest necessity, because the Supreme Court has made clear that the absence of an explicit "manifest necessity" determination does not automatically render a mistrial declaration constitutionally defective. In addition, the State contends that the Court of Special Appeals incorrectly interpreted *Hubbard* as requiring the circuit court to "expressly enumerate each and every alternative considered" in order to justify the mistrial, which the State believes "is contrary to the Supreme Court jurisprudence underlying Maryland case law." Finally, the State asserts that the Court of Special Appeals erred in failing to address the "threshold issue" of whether the relationships between ASA Fockler, PD Fockler, Mr. Ellis, and Mr. Baker created a conflict of interest that gave rise to manifest necessity for a mistrial.

Mr. Baker responds that, although the Court of Special Appeals noted the circuit court's failure to use the precise words "manifest necessity" when declaring the mistrial, the intermediate appellate court did not base its holding on this deficiency alone. Instead, the Court of Special Appeals' holding was that the circuit court "failed to identify what, if

17

any, alternatives were considered prior to declaring a mistrial," and, therefore, the circuit court's analysis was insufficient to support a manifest necessity determination. *See Baker*, 2016 WL 4158892, at *5. Furthermore, Mr. Baker asserts that the Court of Special Appeals did not require the circuit court to expressly enumerate each alternative considered, and agrees with the State "that explicit consideration of alternatives is not required." Instead, Mr. Baker contends that the record "must reflect an actual and careful *consideration* of alternatives," and that the record does not do so here. Finally, Mr. Baker asserts that, although the Court of Special Appeals did not address whether a conflict of interest existed, the intermediate appellate court "clearly *assumed* that an actual conflict of interest existed and, for that reason, addressed whether the trial court abused its discretion by failing to explore, consider, and analyze whether reasonable alternatives to a mistrial existed."

Our review of the record (including both the trial and the hearing on the motion to dismiss) reveals that ASA Fockler learned of Mr. Ellis' unwillingness to testify "on the morning of July 22, 2015"—the day of trial. However, ASA Fockler did not inform the circuit court or defense counsel of this situation until after the 1:47 p.m. recess—after the jury had been impanelled and sworn, and jeopardy had attached. When the court reconvened from this recess at 3:04 p.m., ASA Fockler presented the court with a motion to compel Mr. Ellis' testimony, and indicated that the State had agreed to offer Mr. Ellis immunity in connection with his testimony. Defense counsel objected to the motion to compel, but the circuit court granted the motion. Then, defense counsel requested "that someone call the Public Defender's Office," because Mr. Ellis' defense attorney for his

18

pending charges regarding the Second Incident was ASA Fockler's brother, PD Fockler. Immediately upon learning this information, the court took a recess at 3:16 p.m.

We learn from Mr. Baker's motion to dismiss that, during this afternoon recess, the parties discussed the situation in the judge's chambers, and at least two alternatives to a mistrial were mentioned, if not discussed. First, the parties discussed "the possibility of contacting another attorney from the Office of the Public Defender to advise Mr. Ellis[,] but this ultimately was not done." At the hearing on Mr. Baker's motion to dismiss, the court elaborated on why it rejected this possibility:

> I found that it was not proper for me to assign to Mr. Ellis a new attorney, to appoint a different attorney for him for purposes of advisement with regard to [his right not to testify]. Specifically he has the right to have his own counsel represent him. . . . And I did not think it was proper for the [c]ourt to advise Mr. Ellis that he had to rely on the advi[c]e of another attorney chosen by the Public Defender's Office without the benefit of his counsel who was representing him in the other matter.

Second, according to Mr. Baker, "[t]he judge expressed her concern over continuing the matter to the next day in order to contact someone to advise Mr. Ellis." There is no further indication anywhere in the record why this alternative—a continuance—was ultimately rejected in favor of declaring a mistrial.

The record also reveals that, in addition to having these discussions in chambers, the parties spent at least some portion of the forty-five-minute afternoon recess "upstairs," trying to agree on a date for the new trial.

The trial transcript shows that the court reconvened at 4:01 p.m., at which time it *sua sponte* declared a mistrial over Mr. Baker's objection. In its ruling, the court did not once mention the phrase "manifest necessity," nor did it mention any possible alternatives

19

to a mistrial that had been considered or explored. Instead, the court simply stated that it "did not see how [it] can proceed at this time given these circumstances." At the subsequent hearing on Mr. Baker's motion to dismiss, the circuit court elaborated slightly on its mistrial ruling:

> Based on the fact that the [c]ourt did not believe it appropriate to randomly assign a public defender other than [PD] Fockler to Mr. Ellis to advise him with regard to his Fifth Amendment privileges, advise him with regard to the possible consequences of immunity, I found no reasonable alternatives available at the time. The [c]ourt believed there was a manifest necessity to grant the mistrial.

Based upon this careful review of the record—including the trial proceedings, the hearing on Mr. Baker's motion to dismiss, and the information contained in the motions themselves—we conclude that the circuit court's mistrial declaration was not supported by manifest necessity. First, we are not "persuaded by the record that the trial judge acted responsibly and deliberately, and accorded careful consideration to [the defendant's] interest in having the trial concluded in a single proceeding." *Washington*, 434 U.S. at 516. Instead, the circuit court announced a recess immediately upon learning that Mr. Ellis was represented by ASA Fockler's brother in another pending matter. The recess lasted forty-five minutes, at least some portion of which the parties spent "upstairs" trying to agree on a new trial date, not in the judge's chambers discussing the situation. When the court reconvened, it immediately declared a mistrial. In addition, while the circuit court's failure to utter the words "manifest necessity" in its mistrial ruling does not automatically render the ruling constitutionally defective, *see id.* at 517, the absence of this phrase anywhere in the trial transcript is an additional indication that the circuit court did not "accord[] careful

20

consideration to [Mr. Baker's] interest in having the trial concluded in a single proceeding."

*See id.* at 516.

Although the term "manifest necessity" is not susceptible of precise definition, this Court has previously recognized that there exists a spectrum of circumstances precipitating the declaration of a mistrial. "At one extreme are the mistrials that are not based upon manifest necessity and have been declared to give prosecutors an unfair advantage over the defendant. At the other extreme is the hung jury, considered to be the classic example of what constitutes manifest necessity for a mistrial." *State v. Crutchfield*, 318 Md. 200, 209 (1989) (citations omitted).

> There is a wealth of case law that has fleshed out the spectrum between these two extremes. Manifest necessity exists where there has been a procedural error in the proceedings which would necessitate a reversal on appeal. *Illinois v. Somerville*, [410 U.S. 458, 464 (1973)]. The Supreme Court has also found manifest necessity for a mistrial where a juror has possibly been biased or the juror's impartiality is questionable. *Thompson v. United States*, 155 U.S. 271 (1894) (one of the trial jurors served on the grand jury that indicted the defendant); *Simmons v. United States*, 142 U.S. 148 (1891) (possible juror bias as result of a newspaper article about a letter written by defense counsel which denied that one of the jurors was acquainted with the defendant). **Manifest necessity does not exist where a prosecution witness is absent** or where the mistrial is declared "so as to afford the prosecution a more favorable opportunity to convict . . . ." *Downum v. United States*, 372 U.S. 734, 736 (1963). In *Jourdan v. State*, [275 Md. 495 (1975)], we held that there was no manifest necessity for a *sua sponte* declaration of a mistrial where the prosecuting attorney became ill during the trial and a short continuance until another prosecutor could become prepared was a feasible alternative. Nor does manifest necessity for a mistrial exist where the State's witness could not communicate in the English language and a short continuance to obtain an interpreter would have solved the problem. *In re Mark R.*, [294 Md. 244 (1982)].

*Id.* at 209–10 (emphasis added).

21

"Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence[.]" *Washington*, 434 U.S. at 508. "If, for example, a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred." *Id.* at 508 n.24 (citing *Downum*, 372 U.S. 734); *see also In re Mark R.*, 294 Md. at 262 ("[T]he cases clearly establish that a deficiency in the prosecution's evidence, **whether or not it should have been expected by the prosecutor and whether or not the prosecutor was at fault**, ordinarily does not constitute 'manifest necessity' justifying an unconsented mistrial." (emphasis added)).

Indeed, the circumstances that caused the circuit court to declare a mistrial in this case are similar to those in *Downum*. In that case, "[t]he prosecution allowed the jury to be selected and sworn even though one of its key witnesses was absent and had not been found." *Downum*, 372 U.S. at 735. Moreover, "[t]hat witness was essential only for two of the six counts concerning [the] petitioner." *Id.* at 737. The Supreme Court noted that "[t]he fact is that, when the district attorney impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance." *Id.* (quoting *Cornero v. United States*, 48 F.2d 69, 71 (9th Cir. 1931)). Thus, the Supreme Court held that the petitioner's retrial after a mistrial violated double jeopardy principles. *Id.* at 738.

In this case, Mr. Ellis—one of the State's key witnesses—was constructively absent. Even though he was physically present in the court house (after some period of delay), he refused to testify. Furthermore, even worse than the prosecutor in *Downum* who "impaneled the jury without first ascertaining whether or not his witnesses were present,"

22

ASA Fockler actually knew the morning of trial—before the jury had been impanelled and sworn—that Mr. Ellis intended to invoke his Fifth Amendment privilege and refuse to testify. But instead of alerting the court to this predicament prior to commencing jury selection, ASA Fockler "took a chance" by allowing the jury to be selected and sworn. Moreover, Mr. Ellis' testimony was essential only for the assault charges against Mr. Baker; the State intended to prove the illegal firearm possession charges through the testimony of various law enforcement officers. As will be discussed in more detail below, this fact made one unexplored alternative to a mistrial all the more reasonable under the circumstances—the exclusion of Mr. Ellis' testimony.

We acknowledge that the record considered as a whole indicates that the circuit court did consider at least one alternative to a mistrial during the afternoon recess on July 22: requesting the Public Defender's Office to send over another attorney, other than PD Fockler, to advise Mr. Ellis of his right not to testify. According to Mr. Baker's motion to dismiss, another option was at least mentioned, if not fully explored, during the recess: continuing the trial until the next day to see if another public defender would be available at that time. However, we agree with the Court of Special Appeals that this cursory analysis of potential alternatives is insufficient to support the determination that a mistrial was manifestly necessary.

Furthermore, in his brief, Mr. Baker has suggested some additional alternatives to a mistrial that were never considered (as far as we can tell) by the circuit court. First, the circuit court could have ordered a brief continuance to determine whether another prosecutor was available to replace ASA Fockler. A continuance is among the potentially

23

viable and commonly considered alternatives to a mistrial and, therefore, a trial court's failure to consider it ordinarily constitutes an abuse of discretion. *See, e.g.*, *In re Mark R.*, 294 Md. at 264 (holding there was no manifest necessity for a mistrial when "a short continuance for the purpose of obtaining an interpreter . . . could have solved the problem"); *Jourdan*, 275 Md. at 511 (holding there was no manifest necessity for a mistrial when "no reason has been suggested why the alternate remedy of a continuance was not feasible"); *Cornish v. State*, 272 Md. 312, 320 (1974) ("[A] retrial is barred by the Fifth Amendment where reasonable alternatives to a mistrial, **such as a continuance**, are feasible and could cure the problem[.]" (emphasis added)).

Mr. Baker's motion to dismiss informs us that the trial judge "expressed her concern over continuing the matter to the next day in order to contact someone to advise Mr. Ellis." The record contains no further indication of why that option was rejected. Moreover, the record contains absolutely no mention of the possibility of continuing the trial for a brief period in order to determine whether another prosecutor was available to replace ASA Fockler. Instead, the circuit court only addressed the possibility of replacing ASA Fockler *after* declaring a mistrial and dismissing the jury. At that point, the circuit court asked ASA Fockler—twice—if he would be continuing with the case or if someone else in his office would be taking over. We are unable to discern from the record why the circuit court did not engage in this inquiry prior to declaring the mistrial.

The State asserts that a brief continuance for the purpose of replacing ASA Fockler was not a viable solution because another prosecutor would have "require[d] a significant amount of time to become familiar enough to present the case in a manner consistent with

24

his or her professional responsibilities." In addition, the State asserts that this option "would have moved the case, at the very least, beyond the two-day schedule set by the trial court during voir dire," which would have likely resulted in both witnesses and jurors being unavailable for the trial.

While the State's concerns regarding the feasibility of a continuance are not inconsequential, they are purely hypothetical. The fact is that we do not know, based on this record, how long it would have taken another prosecutor to become familiar with the case so that he or she could replace ASA Fockler. We do not know, for example, whether another prosecutor was already familiar with some aspects of the case and thus would not require a great deal of time to prepare for the trial. We also do not know—if a continuance would have pushed the trial beyond the original two-day schedule—whether this would have affected the availability of the witnesses and jurors. We do not know the answers to any of these questions because the circuit court did not engage in these inquiries on the record, if at all.

A second alternative to a mistrial suggested by Mr. Baker that was not considered by the circuit court is the exclusion of Mr. Ellis' testimony. The State concedes that excluding Mr. Ellis' testimony would "have rendered moot any conflict of interest," but asserts that this was not a reasonable alternative to a mistrial because it "would also have had the effect of severely hampering the State's ability to present its case, in which [Mr.] Ellis was the victim and primary witness." In addition, the State asserts that excluding Mr. Ellis' testimony "would have naturally left the jury speculating as to why the State had chosen not to call the absolutely central, material witness."

25

Mr. Baker responds that excluding Mr. Ellis' testimony would not have "severely hampered the State's case," because both Mr. Ellis and Ms. Mitchell were the alleged victims on the assault charges against Mr. Baker, so Ms. Mitchell presumably could have provided very similar testimony to that of Mr. Ellis. And, because Ms. Mitchell was not facing pending criminal charges in a related matter like Mr. Ellis was, the State offering Ms. Mitchell immunity from prosecution if she refused to testify would not have created the same potential conflict of interest that arose with respect to Mr. Ellis and PD Fockler. Moreover, because Mr. Ellis was not a witness to the illegal firearm possession charges, excluding his testimony would not have affected the State's case on those charges in any way. Therefore, Mr. Baker asserts that when ASA Fockler allowed the jury to be impanelled and sworn, knowing that one of his key witnesses was refusing to testify, the State was left with a choice between trying the case without Mr. Ellis' testimony, or foregoing the prosecution all together—on both the assault charges and the illegal firearm possession charges.

Again, we are unable to determine, based on this record, whether the exclusion of Mr. Ellis' testimony was a reasonable alternative to a mistrial. However, we reiterate "that a deficiency in the prosecution's evidence, whether or not it should have been expected by the prosecutor and whether or not the prosecutor was at fault, ordinarily does not constitute 'manifest necessity' justifying an unconsented mistrial." *In re Mark R.*, 294 Md. at 262. Therefore, if either the State or the circuit court were aware of any reasons why this seemingly reasonable alternative was not in fact viable, they should have included those considerations on the record. Instead, the record contains no mention of the possibility of

excluding Mr. Ellis' testimony, and certainly no analysis of whether this alternative was feasible.

Therefore, we conclude that the State has not satisfied its burden of demonstrating that the mistrial was justified by manifest necessity. *See Washington*, 434 U.S. at 505 ("[T]he prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one."). The fact that the mistrial in this case was *sua sponte*, rather than requested by the State, does not lessen the State's burden to justify reprosecution after jeopardy had attached in the first proceeding. *See, e.g.*, *In re Mark R.*, 294 Md. at 262 (in case where trial court declared mistrial *sua sponte*, noting that the State has a "heavy" burden "of demonstrating that there was 'manifest necessity' for the mistrial" (citing *Washington*, 434 U.S. at 505)). And while we cannot say with certainty that any of the alternatives to a mistrial suggested by Mr. Baker would have alleviated the problem with Mr. Ellis and allowed the trial to continue to an impartial verdict, there is simply not enough consideration of those alternatives on this record for us to conclude that a mistrial was manifestly necessary.[9] Furthermore, we must "'resolve any doubt' in favor of the defendant." *Id.* (quoting *Downum*, 372 U.S. at 738).

---

[9] Contrary to the Dissent's assertion, this Court does not require a trial judge to "consider and reject on the record every alternative that, in hindsight, a party or a reviewing court might identify as 'reasonable.'" *See* Dissent Slip Op. at 1. Instead, our caselaw simply requires that the record reflect an adequate *consideration* of possible alternatives to a mistrial, such that a reviewing court is able to determine whether the mistrial was, in fact, supported by manifest necessity. This determination necessarily entails some degree of "hindsight" by the reviewing court because, as explained in *Hubbard*, the manifest necessity standard "does not only consider whether alternatives were analyzed, but also

27

Finally, the Court of Special Appeals did not err in declining to address what the State characterizes as the "threshold issue" of whether the relationships between ASA Fockler, PD Fockler, Mr. Ellis, and Mr. Baker created a conflict of interest "such that there was manifest necessity to declare a mistrial." As noted above, the "manifest necessity" determination is comprised of three elements, all of which must be present to justify the trial court's declaration of a mistrial over the defendant's objection: 1) there must be a "high degree" of necessity for the mistrial; 2) the trial court "must engage in the process of exploring reasonable alternatives" to a mistrial and determine that none is available; and 3) there must in fact be no reasonable alternative to a mistrial available. *See Hubbard*, 395 Md. at 92–93. The question of whether a conflict of interest existed in this case goes to the first element of manifest necessity—whether there was a "high degree" of necessity for the mistrial. However, the Court of Special Appeals chose to focus on the second element— whether the trial court engaged in the process of exploring reasonable alternatives to a mistrial and determined that none was available—and held that it was lacking. Even if the circuit court was correct in finding that a conflict of interest existed at Mr. Baker's trial, the court was still required to consider whether there was any less drastic alternative to a mistrial that could have alleviated the problem. Because all three elements are required to support a manifest necessity determination, the Court of Special Appeals did not err in

---

goes to whether a reasonable alternative to a mistrial was available." *Hubbard*, 395 Md. at 92–93.

concluding that the circuit court abused its discretion based on the absence of the second element alone.

## CONCLUSION

We hold that the State has not satisfied its burden of demonstrating that the circuit court's *sua sponte* mistrial declaration, over Mr. Baker's objection, was supported by manifest necessity. Specifically, we are unable to determine, based upon our review of the record of both the trial proceedings and the subsequent hearing on Mr. Baker's motion to dismiss, whether there was a reasonable alternative to the mistrial available that could have alleviated the conflict caused by offering Mr. Ellis immunity in exchange for his testimony. The circuit court and the State failed to include sufficient consideration of adequate alternatives on the record, and any doubt must be resolved in favor of the defendant. Therefore, the circuit court abused its discretion in declaring a mistrial over Mr. Baker's objection, and double jeopardy principles bar retrial of Mr. Baker on both the assault charges and the illegal firearm possession charges. The circuit court erred in denying Mr. Baker's motion to dismiss both of his indictments on double jeopardy grounds. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Cecil County
Case Nos. 07-K-15-000189; 07-K-15-000640
Argued: February 2, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 55

September Term, 2016

_____

STATE OF MARYLAND

v.

ANDREW DANIEL BAKER

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by Barbera, C.J., which
Adkins, J., joins

_____

Filed: May 22, 2017

I respectfully dissent. I agree with the Majority's determination that this Court may properly "look to the record of subsequent proceedings," as well as the trial court's mistrial declaration, "in order to determine whether the mistrial was supported by manifest necessity." Majority Slip Op. at 16. I, however, part ways with the Majority's application of the requirement that the trial judge consider reasonable alternatives prior to declaring a mistrial. The Majority's analysis improperly placed upon the trial judge a higher burden than is mandated by the caselaw of the United States Supreme Court and this Court. Consideration of reasonable alternatives is certainly part of the manifest necessity determination. But the caselaw does not require—nor should it—that a trial judge consider and reject on the record every alternative that, in hindsight, a party or a reviewing court might identify as "reasonable"; neither does such omission automatically render the declaration of a mistrial an abuse of discretion.

The Majority properly recognizes that the requirement of "manifest necessity" for a mistrial to be granted over the objection of the defendant does not demand pure necessity. *See id.* at 13. To the contrary, the Supreme Court has expressly cautioned against such an interpretation: "[I]t is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Arizona v. Washington*, 434 U.S. 497, 506 (1978). Moreover, whether manifest necessity to declare a mistrial exists depends upon the unique facts and circumstances of each case. *Hubbard v. State*, 395 Md. 73, 90 (2006) (citing *United States v. Jorn*, 400 U.S. 470, 480 (1971)). "[T]he trial judge is far more conversant with the factors relevant to the determination than

any reviewing court can possibly be and, therefore, we review the trial judge's grant of a mistrial for abuse of discretion." *Simmons v. State*, 436 Md. 202, 212 (2013) (internal citations and quotations omitted) (explaining that a trial judge's mistrial determination is reviewed for abuse of discretion because "[t]he judge is physically on the scene, able to observe matters not usually reflected in a cold record. . . . That is to say, the judge has his finger on the pulse of the trial") (citation omitted).

In making a manifest necessity determination, the trial judge is required to explore reasonable alternatives and determine that there is no reasonable alternative to mistrial. *Illinois v. Somerville*, 410 U.S. 458, 481 (1973); *Hubbard*, 395 Md. at 92. The Majority concludes that, here, there was "simply not enough consideration of those [reasonable] alternatives on this record for us to conclude that a mistrial was manifestly necessary." Maj. Slip Op. at 27. In doing so, the Majority points to two alternatives to mistrial that, in the Majority's hindsight view, were not adequately considered and thoughtfully rejected by the circuit court on the record. The Majority declares: "First, the circuit court could have ordered a brief continuance to determine whether another prosecutor was available to replace ASA Fockler," *id.* at 23; "[a] second alternative to mistrial suggested by Mr. Baker that was not considered by the circuit court is the exclusion of Mr. Ellis' testimony," *id.* at 25.

The Majority cites *Jourdan v. State*, 275 Md. 495 (1975), among other cases, for the proposition that the trial judge could have ordered a brief continuance to determine whether another prosecutor was available to replace ASA Fockler. *See* Maj. Slip Op. at 24. The trial in *Jourdan* involved charges of storehouse breaking and forgery. 275 Md. at 496. The

2

Deputy State's Attorney became ill shortly after trial began and the trial court *sua sponte* declared a mistrial. *Id.* at 498-99. On appeal, this Court concluded that there was not manifest necessity for the mistrial because "the Deputy State's Attorney had taken only ten or fifteen minutes to prepare for trial after having been assigned the cases shortly before the trial was scheduled to begin, and . . . the Assistant State's Attorney was experienced in cases of this nature." *Id.* at 510. Alternatively, "the case could have been continued for a reasonable time until the Deputy State's Attorney was able to resume his duties." *Id.* at 511-12.

Unlike in *Jourdan*, the case before us involved a mutual shootout, giving rise to potential defenses and requiring testimony from 18 prospective witnesses. Even if we were to assume that another Assistant State's Attorney was readily available to replace ASA Fockler, trial preparation surely would have required more than ten to fifteen minutes. In addition, the trial was on a two-day schedule set by the court during voir dire, so any delay would increase the risk of juror unavailability. In any event, it is not within the province of this Court to go so far as to mandate the on-the-record consideration of a continuance to substitute a new ASA. *See Oglesby v. State*, 441 Md. 673, 680 (2015) ("While prosecutorial discretion is subject to oversight by the courts to ensure that it is exercised within constitutional and statutory constraints, 'the office of State's Attorney is not a branch of the judiciary, nor is it directly subject to its supervision.'") (citation omitted).

The Majority has suggested that the trial judge, as an alternative to mistrial, could have omitted Mr. Ellis's testimony, relying on the proposition set forth in *In re Mark R.*, 294 Md. 244, 262 (1982), that "a deficiency in the prosecution's evidence, whether or not

3

it should have been expected by the prosecutor and whether or not the prosecutor was at fault, *ordinarily* does not constitute 'manifest necessity' justifying an unconsented mistrial." (emphasis added); Maj. Slip Op. at 26. That proposition was based in part upon *Downum v. United States*, 372 U.S. 734, 737-38 (1963),[1] which the Majority asserts is "similar" to this case. Maj. Slip Op. at 22. In *Downum,* a prosecution witness "had not been served with a summons" and "no other arrangements had been made to assure his presence." 372 U.S. at 737. The district attorney "impaneled the jury without first ascertaining whether or not his witnesses were present." *Id.* The Court determined that absence of the prosecution witness did not constitute manifest necessity for mistrial because the district attorney "took a chance" and "entered upon the trial of the case without sufficient evidence to convict." *Id.* (quoting from and otherwise likening the facts in *Downum* to *Cornero v. United States*, 48 F.2d 69, 71 (9th Cir. 1931)). Notably, the *Downum* Court clarified that "we refuse to say that the absence of witnesses 'can never justify discontinuance of a trial.' Each case must turn on its facts." *Id.* (citation omitted).

More recently, in *Hubbard*, this Court held that the exclusion of testimony was a reasonable alternative to a mistrial where a witness was called by the State to testify against the co-defendant in a joint trial, after that same witness's identification testimony against the other co-defendant had been suppressed. 395 Md. at 78-81, 93. The State knew five months prior to trial that there were significant problems with admitting such testimony.

---

[1] The Majority correctly quotes *In re Mark R.* A careful read of *Downum*, however, indicates that the *Mark* Court, in citing that case, seems to have overstated the reasoning and holding of *Downum* itself.

*Id.* at 95. The Court determined that the State "created the conundrum" and, therefore, could not be the "beneficiary of a manifest necessity analysis." *Id.*

In contrast to *Downum*, the State in the present case neither "took a chance" nor allowed the jury to be impaneled without first ascertaining whether or not its witnesses were present. Moreover, unlike in *Hubbard*, the State did not create the conflict-of-interest conundrum in an effort to benefit from a mistrial. Rather, on the morning of trial, to ASA Fockler's knowledge, Mr. Ellis had every intention of appearing and testifying without issue. Although Mr. Ellis eventually indicated upon arrival that he intended to invoke his Fifth Amendment privilege against self-incrimination, at the outset of the proceedings, the offer of immunity to Mr. Ellis remained a valid option for securing the testimony.[2]

The sibling relationship that formed the basis of the trial court's conundrum—the potential conflict of interest stemming from the offer of immunity to Mr. Ellis—was not discovered until that afternoon, after the jury was sworn. Because the conflict of interest stemmed from that sibling relationship, the trial judge properly focused on potential mistrial alternatives related to that relationship, rather than removing Mr. Ellis's testimony altogether. The trial court did not abuse its discretion, under the circumstances in this case,

---

[2] "[T]he Supreme Court of the United States has recognized that the power of the State to compel a witness to testify is at the core of the proper functioning of our criminal justice system." *State v. Rice*, 447 Md. 594, 604 (2016) (citing *Kastigar v. United States*, 406 U.S. 441, 443-44 (1972)). Indeed, immunity statutes "balance the witness's privilege against compelled self-incrimination with the legitimate power of government to compel persons to testify" and "have been referred to 'as part of our constitutional fabric.'" *Id.* at 604-05 (citation omitted). The State retains sole discretion to determine whether the compelled testimony may be necessary to the public interest, while the trial court plays a "largely ministerial role" in considering that determination. *Id.* at 626, 629.

5

in declining to articulate and fully consider on the record the two alternatives suggested by the Majority.

In short, although consideration of reasonable alternatives is part of the manifest necessity determination, a trial judge's failure to exhaust and dictate on the record all of those alternatives, and its reasons for rejecting each alternative, should not render the declaration of a mistrial an abuse of discretion. Neither this Court, nor the Supreme Court, has ever required such express findings on the record. *See Blueford v. Arkansas*, 132 S. Ct. 2044, 2052 (2012) (stating, in the context of a hung jury, that, "[w]e have never required a trial court, before declaring a mistrial . . . to consider any particular means of breaking the impasse"); *see also Washington*, 434 U.S. at 517 ("The state trial judge's mistrial declaration is not subject to collateral attack . . . simply because he failed to find 'manifest necessity' . . . *or to articulate on the record all the factors* which informed the deliberate exercise of his discretion.") (emphasis added). To increase the burden placed on our trial judges, in the midst of a trial and without the benefit of hindsight on appellate review, would "render[] the trial judge a useless appendage in the judgmental process of determining whether a mistrial was manifestly necessary in the interest of public justice." *State v. Crutchfield*, 318 Md. 200, 214 (1989).

The trial judge noted at the hearing on Mr. Baker's motion to dismiss that it had considered alternatives to a mistrial, including finding another attorney for Mr. Ellis, but rejected those alternatives as inappropriate under the circumstances. I cannot say in this case that the trial judge's exercise of discretion was "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Simmons*, 436 Md. at 212 (citation

6

omitted).  Rather, I am of the opinion that, "[i]n evaluating the manifest need for the mistrial, [the trial judge] proceeded with 'the greatest caution, under urgent circumstances, and for very plain and obvious causes.'"  *Crutchfield*, 318 Md. at 215 (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).  Accordingly, I would reverse the judgment of the Court of Special Appeals.

Judge Adkins has authorized me to state that she joins this dissent.